COMMONWEALTH vs. VICTOR MORAN.

No. 07-P-254.

Suffolk. April 18, 2008. - October 21, 2009.

Present: PERRETTA, MILLS, & RUBIN, JJ.[1]

*Homicide. Practice, Criminal,* Voluntariness of statement, Waiver, Argument
by prosecutor, Instructions to jury. *Constitutional Law,* Waiver of
constitutional rights. *Evidence,* Voluntariness of statement.

A Superior Court judge did not err in denying a criminal defendant's pretrial
motion to suppress statements that he made to his sister while at a police
station, where there was no evidence to support the defendant's suggestion
that the police intentionally placed his sister in a room with the defendant
in order to surreptitiously monitor their conversation or to evoke an inculpa-
tory emotional response, and where no other circumstances, such as a
delay in the defendant's arraignment and the appointment of counsel for
him, affected the voluntariness of the statements, which were made after
the defendant had received Miranda warnings and had acknowledged his
understanding of them. [518-520]
A Superior Court judge did not err in denying the criminal defendant's pretrial
motion to suppress inculpatory admissions that he made to police, where
there was no evidentiary basis for concluding that the defendant's state-
ments, and his waiver of his Miranda rights, were other than the result of
his free and voluntary act. [520-521]
At the trial of an indictment charging murder in the first degree, the prosecu-
tor, in his closing, permissibly argued fair inferences, reasonably drawn
from the defendant's own statements and actions, that pointed to what the
defendant may have been thinking at the time of the murder [521-524];
further, any error arising from the prosecutor's remarks, which undercut the
defendant's theory of self-defense, did not require reversal of the conviction,
in light of the judge's instructions to the jury, as well as the jury's verdict of
guilty of murder in the second degree, which demonstrated the jury's rejec-
tion of the prosecutor's contentions, and also the defendant's own admis-
sions that undermined his theory of self-defense [524-526].
A criminal defendant convicted of murder in the second degree failed to
demonstrate that the judge's instruction regarding the jury's obligation to
consider the offenses of murder in the first and second degree before ad-
dressing the lesser included offenses of voluntary and involuntary
manslaughter, even if error, caused a difference in the jury verdict. [526-527]

[1]Justice Perretta participated in the deliberation on this case and authored
this opinion prior to her retirement.

INDICTMENT found and returned in the Superior Court Department on December 12, 2002.

A pretrial motion to suppress evidence was heard by *S. Jane Haggerty*, J., and the case was tried before *Margaret R. Hinkle*, J.

*Richard J. Shea* for the defendant.

*Macy Lee*, Assistant District Attorney (*Paul M. Treseler*, Assistant District Attorney, with her) for the Commonwealth.

PERRETTA, J. After a jury trial on an indictment charging murder in the first degree, the defendant was found guilty of the lesser offense of murder in the second degree. On appeal he argues that his motion to suppress statements should have been allowed, the prosecutor's closing argument was unduly prejudicial, and the judge's jury instructions were flawed. We affirm the conviction.

1. *The evidence.* a. *The Commonwealth's case at trial.* The Commonwealth presented evidence at trial to show that at about 2:00 A.M. on October 7, 2002, the victim and the defendant began their work shift at the Garden Fresh Company (Garden Fresh) facility in Chelsea, where they were employed washing and cutting produce. The defendant had been employed at Garden Fresh for about two years and the victim for more than twelve. When the defendant was cleaning a large machine at the end of the shift, the victim splashed water and threw trash on the machine.

According to one witness, Ronaldo Caseres, the victim regularly threw trash on the defendant's machine, an act which frequently caused the two men to argue. This occasion was no different. The defendant and the victim exchanged profanities, and the victim told the defendant to come and fight. Another witness, Americo Cornejo, intervened and was able to stop the argument for the moment.

According to Cornejo, the defendant continued washing the machine for a few more minutes and then went to an upper level to change his clothes and prepare to leave. In the meantime, Cornejo remained with the victim, who was still angry, trying to calm him down. When the defendant returned to the lower level, he walked past the victim without saying anything and went

outside to leave for the day. A few minutes later, the victim also went outside, walking in the same direction as the defendant.

Cornejo remained inside the building to finish cleaning one of the machines. Looking through two entryways that were partially covered, one with a curtain and the other with a sliding door, Cornejo had a limited view of the outside area. He could see that the victim was standing on the loading dock, removing tape from his arm and putting it in one of the dumpsters below the loading dock.[2] Cornejo next saw the victim quickly turn and move, as though he were running at or charging someone.

Dropping what he was doing, Cornejo ran outside. There he saw the victim walking backwards, towards the building, clutching his chest with blood-covered hands. Cornejo also saw that the defendant, standing about three to four feet from the victim, was holding a knife, which he tossed into one of the dumpsters.[3] Cornejo was able to pull the victim to the inside of the building while seeing the defendant grab his bicycle and pedal away.[4]

When the paramedics arrived, they found the victim "just off of the loading dock in . . . a doorway-type area," with a wound to his left side and shallow breathing. He was taken to the hospital where he died due to a stab wound that had punctured his lung and a pulmonary artery. The police arrived shortly after the paramedics. In securing the scene, an officer from the Chelsea police department found a bloody knife in one of the dumpsters. The State police retrieved the knife, which was determined to be one of the many knives used at Garden Fresh to chop produce.

b. *Evidence common to the trial and to the hearing on the motion to suppress.*[5] Two days later, at approximately 1:30 P.M., the defendant was apprehended and arrested in Lynn. With the assistance of a Spanish-speaking officer, Carlos Vega, the defendant was initially "booked" in Lynn[6] and given his Miranda warnings in Spanish. There the defendant acknowledged that he

---

[2]The jury took a view of the loading dock area as well as certain interior portions of the building leading to the loading dock.

[3]There were also three other employees on the loading dock at this time, Pascual Curruchiche, Eduardo Blanco, and Bernadino Poz.

[4]The defendant never returned to his home after the fatal stabbing.

[5]As relevant to our review, there was no substantial difference between the trial testimony and the evidence at the motion hearing.

[6]There was testimony to show that the defendant's "booking" in Lynn was

understood his rights and signed a preprinted Miranda form written in Spanish. Shortly thereafter, the defendant was transported to the Chelsea police station.

At the defendant's request, Lydia Moran (Lydia), the defendant's sister, was brought to the Chelsea police station. She first spoke in Spanish with Rosalba Medina, a bilingual detective with the Chelsea police department. When the defendant was soon thereafter brought into a room to speak with Lydia as he had asked, Medina remained present while the defendant spoke to his sister in Spanish.

At one point during the defendant's conversation with Lydia, Medina left the room for less than a minute to retrieve a piece of paper and a pen so that Lydia could write down the information her brother wanted her to have. In leaving the room, Medina left the door ajar. Moments later as she was returning to the room, Medina heard the defendant ask and tell Lydia, "[D]id he die? [T]he son of a whore. . . . I went inside. I grabbed this big knife, and I inserted it all, all the way in . . . ."[7] Medina gave the paper and pen to Lydia and again left the room.

Two State police detectives next entered the room, joined by Medina, whose primary purpose was to serve as an interpreter. After again being advised of his Miranda rights, the defendant again acknowledged that he understood them, signed another Miranda form printed in Spanish, and agreed to be interviewed. The thirteen-minute interview that followed, which began at about 4:30 P.M., was recorded on audiotape[8] and was transcribed and translated. Both the recording and the transcript were admitted into evidence.

The essentials of the interview were as follows. As the defendant told the police, he was cleaning machines when the victim

what is referred to as a "courtesy booking." According to the testimony, a "courtesy booking" occurs whenever someone is arrested on behalf of another jurisdiction; it is a booking of an individual done by the jurisdiction making the arrest when the arrested individual is then to be transferred to the department seeking the arrest.

[7]Before the defendant's statements were admitted in evidence, the trial judge, at defense counsel's request, gave a "humane practice" instruction to the jury. See Commonwealth v. Tavares, 385 Mass. 140, 149-152 (1982).

[8]The immediately preceding reading of Miranda rights to the defendant (in Spanish) and the defendant's waiving of those rights were not tape-recorded.

began to insult him. Nevertheless, the defendant walked away to change his clothes and prepare to leave. When the defendant left the building, he walked to the area where he kept the bicycle which he rode to and from work. The victim followed him, arguing and challenging him to a fight, and throwing the first punch which sparked a fistfight. As the victim began to get the better of the fight, almost throwing the defendant into a dumpster, the defendant ran "far inside" the factory to grab a knife. He told the victim, "[T]oday I'm really going to stop you." Nonetheless, the victim kept advancing and hitting the defendant, who maintained his hold on the knife and stabbed the victim. As put by the defendant, "I stopped him . . . . [I] stuck him with the knife and he started screaming 'police, police.' " When the defendant saw blood coming from the victim's body, he threw the knife in the dumpster, got on his bicycle, and rode away.

c. *The defendant's evidence at trial.* Going forward on a theory of self-defense and without testifying on his own behalf, the defendant offered the grand jury testimony of Eduardo Blanco, an unavailable witness who was also a Garden Fresh employee as well as the defendant's cousin. According to Blanco's testimony, he saw the victim and the defendant fighting on the loading dock. Blanco turned away but then turned back to see the defendant "walking backwards and that [the victim] was throwing punches at him." As next related by Blanco, the victim "grabbed his side and was bleeding, and then [the defendant] threw the knife into the trash." The defendant then rode off on his bicycle in a direction he "generally doesn't go."

Pascual Curruchiche testified on the defendant's behalf. He related that he was on the loading dock when the victim came outside as the defendant was retrieving his bicycle to leave Garden Fresh. Although some distance from the two men, Curruchiche could see that as the two men got closer to each other, the defendant dropped or threw down his bicycle and a fight erupted. Curruchiche could see the victim advancing on the defendant, punching, kicking, and getting on top of the defendant, who was attempting to throw some blows to the victim while also trying to retreat and protect his body. Hearing the victim say that the defendant had hurt him, Curruchiche saw the victim run back inside to seek help. Curruchiche stated that the first time he saw

the knife was when the defendant threw it into the dumpster. Curruchiche also testified that from the moment the fight started to the moment he first saw the knife, he did not see the defendant run back inside the building.

2. *Discussion.* As earlier set out, the defendant has raised three claims of error. We conclude that no error requires reversal of his conviction on so much of the indictment as charged him with murder in the second degree.

a. *The motion to suppress statements.* The defendant sought to suppress the statements he made to his sister, Lydia, as well as his statements to the police.[9] A two-day evidentiary hearing was held on his motion, which was denied by a judge other than the trial judge, for reasons set out in her memorandum of decision.

(1) *The defendant's statements to his sister.* The defendant contends that his statements to Lydia were not voluntary. A defendant's statements to a private citizen can be used against him in a criminal trial only if the challenged statements are voluntarily made. See *Commonwealth* v. *Allen*, 395 Mass. 448, 456-457 (1985); *Commonwealth* v. *Taylor*, 426 Mass. 189, 196 (1997). A determination of voluntariness depends upon the totality of the circumstances. *Commonwealth* v. *Allen*, *supra* at 454-455.

Here the evidence elicited at the suppression hearing shows, and the motion judge found, that before the defendant made the statements in issue, he was advised of his Miranda rights at the Lynn police department and he acknowledged that he understood them. He was next brought to the Chelsea police department where he was again booked on the charge of murder. Throughout this process, the defendant seemed calm at times and tense at others. However, he was responsive and appeared to understand the severity of his situation. The fact that he asked to talk with Lydia the moment after the Chelsea police indicated that they wanted to interview him speaks to his ability to act rationally and voluntarily in the circumstances in which he found himself.

---

[9]Although the motion judge found facts pertaining to the defendant's statements to his sister, the judge's ruling suggests that she viewed and treated the defendant's motion to suppress as presenting a challenge only to the admissibility of his statements to the police. Based upon a generous reading of the transcript of the motion hearing and in an abundance of caution, we assume without deciding that the defendant's argument in respect to the statements he made to his sister is properly before us, and we take it up on the basis of the facts found by the judge.

There is an absence of evidence to support the defendant's suggestion that the police intentionally placed Lydia in the room in order to deliberately monitor the defendant's statements to her or to break down his capacity to resist their questions. Nor is there anything in the record to show that Lydia was acting as an agent of the police. Rather, the record suggests that the overhearing of his statement was purely accidental. Thus, this case does not present the question that otherwise might be presented as to the police practice of placing a friend or relative in a room with the defendant in order to surreptitiously monitor their conversation or to evoke an inculpatory emotional response. Cf. *Commonwealth* v. *Taylor, supra* (defendant's statements to sister present at police station for purposes of comfort and support voluntarily made).

As a final assertion in support of his claim that his statements to Lydia were not voluntarily made, the defendant argues that his arrest and "courtesy booking" in Lynn (see note 6, *supra*) followed by his booking in Chelsea delayed his arraignment and appointment of counsel. According to the defendant, that delay he alleges to have experienced is part of the "totality of the circumstances" that demonstrates the involuntariness of his statements. The approximately three-hour time lapse between the defendant's arrest and the time at which he spoke with Lydia was far short of six hours and was not unreasonable. See *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (a statement made within six hours of an arrest is not to be excluded from evidence on the ground of unreasonable delay provided that it is otherwise admissible).

There is nothing in the evidence elicited at the suppression hearing to show physical or psychological coercion of the defendant or that he was suffering from a physical or mental infirmity or abnormality caused by drugs or alcohol. See *Commonwealth* v. *Allen*, 395 Mass. at 456-457; *Commonwealth* v. *Taylor*, 426 Mass. at 196. The established facts of the matter include that before the defendant made the statements in issue to Lydia, he had received Miranda warnings and had acknowledged his understanding of them. See, e.g., *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986) (Miranda warnings are factor in voluntariness analysis). Based upon the facts found as supported by the evidence, as well as the law applicable to the established

facts, the conclusion is inescapable that the defendant's statements to Lydia were voluntarily made.

(2) *The defendant's statements to the police.* We next consider the defendant's argument that his inculpatory admissions to the police should be excluded on the basis that they were the product of his earlier interaction with Lydia and were not voluntarily and intelligently made. Because we have concluded that the defendant's statements to Lydia were voluntary, we consider only the voluntariness of his statements to the police.

"A statement is voluntary if it is 'the product of a rational intellect and a free will.' " *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000), quoting from *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). In evaluating the voluntariness of a defendant's statement, a number of factors are to be considered, including the following: age; education; intelligence; emotional stability; physical and mental condition; conduct of the defendant; who initiated the conversation with the police; experience with and in the criminal justice system; the details of the interrogation, including recitation of Miranda rights; and whether any promises or inducements were made by the police. See *Commonwealth* v. *Mandile, supra*; *Commonwealth* v. *Novo*, 442 Mass. 262, 267 (2004). The defendant urges that we consider that at the time of his arrest, he was a native of Guatemala who was only twenty-one years of age, spoke very little English, and had no experience in the criminal justice system. He argues that these factors were exacerbated by an unreasonable delay of three hours between the time of his arrest and his statements to the police.

When, however, the controlling factors are considered with the totality of circumstances attending the questioning of the defendant, the evidence shows, and the judge properly found, that the defendant was twice read his Miranda rights in Spanish; he readily responded in the affirmative each time when asked if he understood those rights; he indicated on each occasion that he wished to speak to the police; and each time he signed the Miranda form, printed in Spanish, provided to him. The judge also found that "[a]lthough the defendant was nervous, he appeared to understand not only some English but also the severity of his situation." Considering additional and pertinent factors, the judge found that the defendant responded quickly and efficiently to the questions put to him; the conditions of the

room in which the interrogation took place did not create a coercive environment; there was no indication that the police used either force or promises or assurances of leniency or any other coercive measure to induce the defendant's confession; and the three-hour time lapse between the time of the defendant's arrest in Lynn and his statement to the police in Chelsea was not unreasonable. Based upon our review of the motion judge's findings, which are supported by the evidence,[10] and her conclusions of law, with which we agree, we find no basis for concluding that the defendant's statements were other than the result of his free and voluntary act. See *Commonwealth* v. *Mandile*, 397 Mass. at 412-413.

The defendant also asserts that his waiver of his Miranda rights was not voluntarily made.[11] However, his argument does not take into account *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995), wherein the court stated that "[t]he voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors." Once again, the judge made detailed findings concerning her conclusion that the defendant's waiver of his Miranda rights was knowingly, intelligently, and voluntarily made. Our independent review of the judge's conclusions, which were based upon her findings having clear support in the record, requires no lengthy discussion. It is enough to state that on the law applied to the facts found by the judge pertaining to the defendant's waiver of his Miranda rights, we too conclude that his waiver of those rights was voluntarily made.

b. *The prosecutor's closing argument.* The prosecutor began his closing argument with the following statements:

"Premeditated murder. Let me read you some of the words that you haven't heard since [the defendant's tape-recorded statement was played for you,] five days ago. He

---

[10]The defendant makes no real argument concerning the evidentiary basis for the motion judge's factual findings.

[11]Although the defendant in part argued below that the Commonwealth had failed to prove the completeness of the Miranda warnings given, he does not make that argument on appeal.

was only behind me, and that's when he started saying that what was the god damn problem I had with him, that what was my problem, that I told him that I had no problem with him. Well, then he said to me that if I wanted blows that there was going to be blows. Then I said, okay, fine, I said. We started fighting and fighting and fighting and fighting, then he was already controlling me, and was going to throw me into the dumpster, and that's when I realized I was going to fall. I ran into the factory to bring a knife, so to bring a knife. Then I sure told him that today I'm really going to stop you, and I stopped him. I said, just stopped him. I just, just stuck him with the knife, and he started screaming, police, police.

"Those aren't my words, ladies and gentlemen. Those are his words, the words spoken to the police after getting Miranda twice on October 9, 2002, two days after he murdered Juan Marchante. Premeditated murder.

"How long does it take to conceive of a plan to kill somebody? You'll be instructed on premeditated murder, murder in the first degree. Seconds. Think about what he told you through [his tape-recorded statement]. What did he do. I was in a fight. I got away from the person I was fighting. I went into the building. How far, he says it in his statement, far. All those steps he took going to retrieve that knife. What am I doing? *I'm going to get a knife, and I'm going to kill him.*

"He retrieves the knife. More time to contemplate. What am I going to do with that knife? *I'm going to take that knife, and I'm going to go kill him.* He returns all the way back and says, I stopped him. He inserts that knife into [the victim] seven inches deep. . . .

"If you remember, I pointed out some doors to you [on the view], the testimony was the doors were open, so as he is running for that knife, instead of going out a door, door one, door two, door three, door four, instead of going to a boss, instead of going to his sister, instead of going to his cousin, instead of going to his friends, he decides to arm himself with a knife and use that knife. Premeditated murder." (Emphases added.)

It is the underscored portions of the prosecutor's argument that drew an objection from defense counsel. The judge ruled that the jury's possession of the recorded statement in the jury room, and her preliminary and final instructions to the jury that arguments are not evidence, would rectify any potential prejudice to the defendant from those remarks.

In support of the propriety of the prosecutor's remarks, the Commonwealth asserts that the challenged statements were made in response to a rhetorical question posited by the prosecutor for purposes of focusing the jury's attention on the defendant's statements to the police and the fair inferences that could be drawn therefrom. The question now before us is whether the prosecutor properly could argue inferences from the evidence that point to what the defendant may have been thinking at the time of his criminal act.

Seldom is there direct evidence of a defendant's thoughts, and a prosecutor may argue fair inferences from the evidence that point to what the defendant may have been thinking. See, e.g., *Commonwealth* v. *Smith*, 450 Mass. 395, 408 (2008); *Commonwealth* v. *Deloney*, 59 Mass. App. Ct. 47, 51 (2003). As stated in *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993), "inferences suggested by the prosecutor need only be reasonable and possible and need not be necessary or inescapable."

According to the version of events given by the defendant to the police, he was angry with the victim who, as in the past, initiated the fight with him. As the victim was getting the better of him, the defendant admittedly broke away from the victim, ran back into the building, and grabbed a knife. He then returned outside and "told [the victim] that, today I'm really going to stop you, and I stopped him." The defendant stated that at the very moment he inflicted the fatal stab wound, he told the victim, "[N]ow I am going to stick you."

Although the prosecutor's suggestion that the defendant grabbed the knife intending to kill the victim is only a possible inference to be drawn from the evidence, it is not an unreasonable inference. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990) (imaginary or hypothetical dialogue presented to jury during closing argument must be in accord with inferences that could be fairly drawn from the evidence at trial). To the extent

the prosecutor's remark in the instant case appears to be very similar to the statement found objectionable in *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. 577, 581-583 (1993), there is a critical distinction. In *Pavao*, there was evidence to show only that the defendant had told a witness that he was going to "get" the victim. *Id.* at 581. In closing argument, however, the prosecutor referred to the defendant as having said that he was going to "kill" the victim. *Ibid.* In the case now before us, the prosecutor's argument referred to what the defendant might have been thinking based upon an inference reasonably drawn from his own statements and actions rather than attributing to a defendant a statement never made.

Even were we to conclude that the prosecutor's remarks in the instant case were error, it would not axiomatically follow that any such error requires reversal of the conviction. We would next consider the four factors set out in *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000): "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions."

The record establishes that the defendant seasonably lodged an objection to the prosecutor's challenged statements. Moreover, the statements to which an objection was lodged did not go to a collateral issue. Rather, the statements in issue undercut the defendant's claim of self-defense by attributing to him the intent necessary to prove murder.

Although the judge did not specifically address the objected-to remarks in instructing the jury, she made it clear to the jury before the trial began, as well as immediately preceding closing argument and during her final instructions, that closing arguments were not evidence and that in the event a juror's memory conflicts with an attorney's representation of the evidence, the juror's memory controls. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987), observing that the law presumes that when properly instructed, the jury understand that closing argument is argument and not evidence and that such "instructions may mitigate any prejudice in the final argument." Contrast *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. at 582-583, where

the judge's specific instruction regarding the prosecutor's unfounded statement exacerbated the error by allowing "the jury to reflect upon the statement in considering the defendant's intent."

The remaining, and we think decisive, factor to be considered is whether, in the circumstances, the remarks, if error, possibly made a difference in the jury's verdict. In our view, the jury's verdict, guilty of murder in the second degree and not in the first degree, shows that the jury rejected the prosecutor's contention that the killing was premeditated, that the defendant had harbored a plan to kill the victim. Moreover, we cannot conclude that the defendant's theory of self-defense was undercut by the prosecutor's remarks rather than by the strength of the Commonwealth's evidence, which included the defendant's own statements to the police that he broke away from the fight to run and grab a knife and then returned to stab the unarmed victim. Because the intent necessary to prove murder, malice, could be inferred from the use of a deadly weapon, the defendant's admitted obtaining of a knife and returning to the victim with it was powerful evidence of the only contested element of the offense of murder in the second degree. See *Commonwealth* v. *Begin*, 394 Mass. 192, 197 (1985) (malice may be inferred from intentional use of deadly weapon).

Also to be considered is the evidence of the defendant's admitted ability to break free of the fight with the victim and run from the loading dock into the building. Such evidence undermined his theory of self-defense, given the fact that the right to act in self-defense only accrues when retreat is not possible. See, e.g., *Commonwealth* v. *Espada*, 450 Mass. 687, 700 (2008) ("[T]he defendant would not be entitled to a self-defense instruction where he initiated the confrontation and failed to retreat or attempt to retreat . . . [and] presented no evidence that there was no reasonable means of escape available"). Viewing the prosecutor's closing argument in light of the evidence presented during the entire trial and the factors set out in *Commonwealth* v. *Kater*, 432 Mass. at 422-423, we conclude that even if the prosecutor's remarks constituted error, any such error was not likely to have influenced the verdict. See *Commonwealth* v. *Loguidice*, 420 Mass. 453, 456 (1995).

Equally unavailing is the defendant's contention that the prosecutor improperly evoked sympathy for the victim by referring to his three children. Even were the comment intended to invoke undue sympathy, reversal of the conviction would not be warranted in view of the judge's instruction to the jury that they were not to decide the case on the basis of sympathy.

c. *The jury instructions.* As his final argument, the defendant claims that the judge's unobjected-to instruction regarding the jury's obligation to consider the offenses of murder in the first and second degree before addressing the lesser included offenses of voluntary and involuntary manslaughter created a substantial risk of a miscarriage of justice.[12] Regardless of whether there was error, there was no substantial risk of a miscarriage of justice.[13] The defendant's theory at trial was self-defense, and he presented evidence that he stabbed the victim immediately following the victim's attack on him by punching and kicking. However, the Commonwealth presented overwhelming evidence to disprove the theory of self-defense. In his statement to police, the defendant admitted that he was able to leave the fight to go

---

[12]After explaining that the defendant was charged with murder in the first degree, which has the lesser included offenses of murder in the second degree, voluntary manslaughter, and involuntary manslaughter, the judge further instructed the jury as follows:

"I will tell you that you may address a lesser included offense only if you are not convinced beyond a reasonable doubt that the defendant is guilty of the greater offense. In other words, you do not consider murder in the second degree unless you are convinced, you consider, let me put it this way. You consider murder in the second degree only if you are not convinced beyond a reasonable doubt that the defendant is guilty of murder in the first degree, so you must first consider the most serious of the offenses.

"You do not consider voluntary manslaughter unless you are not convinced beyond a reasonable doubt that the defendant is guilty of murder in the second degree. You do not consider involuntary manslaughter unless you are not convinced beyond a reasonable doubt that the defendant is guilty of voluntary manslaughter, and we have rank ordered the offenses in the verdict slip."

[13]Two members of the panel are of the view that the instruction was flawed. See *Commonwealth* v. *Roth*, 437 Mass. 777, 794 n.14 (2002); *People* v. *Mays*, 407 Mich. 619, 621-623 (1980). The author disagrees. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 592-593 (2001). See also Model Jury Instructions on Homicide 19-20 (1999).

back into the building, but that he then got a knife from the building and returned to stab the victim. See *Commonwealth* v. *Benoit*, 452 Mass. 212, 226 (2008) ("[T]he privilege to use self-defense arises only in circumstances in which the defendant uses all proper means to avoid physical combat"). The Commonwealth also presented uncontested testimony that neither the victim nor the defendant had any wounds on their bodies (other than the stab wound to the victim). We are confident that, had the challenged instruction not been given, the jury verdict would have been the same.[14] See *Commonwealth* v. *Oliveira*, 445 Mass. 837, 845 (2006).

3. *Conclusion.* It follows from all that we have said that there is no basis for disturbing the jury's verdict.

*Judgment affirmed.*

---

[14]We are also not persuaded by the defendant's argument that, in the absence of the challenged instruction, the jury might have instead convicted the defendant of involuntary manslaughter on a wanton and reckless theory. The risk of physical harm from stabbing the victim in the chest with a large knife, creating a wound seven inches deep, was so great as to create a plain and strong likelihood of death. See, e.g., *Commonwealth* v. *Burgess*, 450 Mass. 422, 439 (2008) (stabbing the victim twice, creating deep and fatal injuries to the victim's chest and abdomen, did not warrant wanton and reckless manslaughter instruction). No view of the evidence warranted a finding of merely wanton and reckless conduct rather than intentional killing.