COMMONWEALTH *vs.* FERNDY ELYSEE
(and five companion cases[1]).

No. 07-P-1169.

Suffolk. December 4, 2009. - September 29, 2010.

Present: GREEN, RUBIN, & WOLOHOJIAN, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Search and Seizure,* Automobile, Threshold police inquiry. *Practice, Criminal,* Severance, Judicial discretion, Required finding, Argument by prosecutor. *Threshold Police Inquiry. Evidence,* Constructive possession.

Discussion of Federal and State constitutional law regarding the justification necessary for an exit order issued by police during the course of a lawful stop of a motor vehicle. [839-841]

Police officers had sufficient justification to issue an exit order to the criminal defendant, who was a passenger in a motor vehicle that the officers lawfully had stopped, where movement in the vehicle while the officers approached indicated the concealment of something (given the circumstances of the stop, likely a weapon), and the defendant's failure to answer when asked to identify himself and his lying about having identification served to bolster the officers' suspicion that some contraband, likely a weapon, was somewhere in the vehicle; moreover, the officers did not improperly extend the stop. [841-844]

A Superior Court judge did not abuse his discretion in denying the criminal defendant's motion to sever his trial from that of his codefendant, where the defenses asserted were not mutually antagonistic. [844-845]

At the trial of indictments charging the defendants with possession of a firearm without a license, possession of ammunition without a firearm identification card, and unlawful possession of a firearm containing ammunition, the evidence was sufficient to support a finding of constructive possession beyond a reasonable doubt with respect to each defendant. [845-848]

At a criminal trial, the admission of testimony of a conversation between police officers and the defendants was not error [848]; further, no error arose during the prosecutor's closing argument [848-849]; lastly, the defendant suffered no prejudice from the judge's reading, in response to a jury request, of an excerpt from a statute [849].

COMPLAINT received and sworn to in the Dorchester Division of the Boston Municipal Court Department on December 20, 2006.

[1] Two of the companion cases are against Ferndy Elysee and three are against Richard Davis.

A probation violation proceeding was heard by *James W. Coffey*, J.

INDICTMENTS found and returned in the Superior Court Department on March 29, 2007.

After consolidation, a pretrial motion to suppress evidence was heard by *Charles J. Hely*, J.; a motion for severance was heard by *Frank M. Gaziano*, J., and the cases were tried before him.

*Michael A. Waryasz* for Ferndy Elysee.

*Robert E. Fox* for Richard Davis.

*Kris C. Foster*, Assistant District Attorney, for the Commonwealth.

RUBIN, J. Two firearms were found in a vehicle in which defendants Ferndy Elysee and Richard Davis were passengers after a Boston police officer ordered Davis to exit the vehicle when it was stopped for a traffic violation. The defendants were each charged with possession of a firearm without a license, G. L. c. 269, § 10(*a*), second offense, G. L. c. 269, § 10(*d*); possession of ammunition without a firearm identification card, G. L. c. 269, § 10(*h*); and unlawful possession of a firearm containing ammunition, G. L. c. 269, § 10(*n*).[2] A jury found the defendants guilty of each offense, with each defendant subsequently pleading guilty to the second offense portion of the indictments issued pursuant to G. L. c. 269, § 10(*d*). The defendants each timely filed a notice of appeal.[3]

The defendants both challenge the denial of a motion to suppress, the sufficiency of the evidence presented at trial, and the admissibility of certain witness testimony. Davis also challenges

[2]Initially, a criminal complaint issued against Elysee, charging him with committing these three offenses, as well as with possession of a large capacity weapon, G. L. c. 269, § 10(*m*). After a hearing, a judge of the District Court found that Elysee had violated his probation on a prior conviction based on the new offenses. Elysee timely filed a notice of appeal. A grand jury subsequently issued criminal indictments charging each defendant with the three offenses described in the text, as well as charging defendant Davis, rather than Elysee, with possession of a large capacity feeder — a charge on which the judge entered a required finding of not guilty — and charging Elysee as an armed career criminal, G. L. c. 269, § 10G, a charge that was dismissed by agreement with the Commonwealth.

[3]These appeals have been consolidated with Elysee's appeal from the District Court order revoking his probation.

a portion of the Commonwealth's closing, and Elysee also challenges the denial of a motion to sever and a supplemental instruction given by the judge in response to a question from the jury.[4] We discuss each claim of error in turn.

## I.

We are presented first with a question concerning the lawfulness of the police officer's order that a passenger of a motor vehicle stopped for a traffic violation exit the vehicle. Both defendants filed pretrial motions to suppress the two firearms that were found in the vehicle as a result of that exit order, citing both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. In his memorandum of decision and order denying those motions, the motion judge made findings of fact and adopted as fact the testimony of Boston police Officers Brian Ball, Ismael Henriquez, and Joel Resil, which he found to be truthful. On appeal, we review the motion judge's subsidiary findings of fact for clear error, and "independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004).

## A.

As drawn from the motion judge's findings and the testimony of the three officers, the facts supported by the record are as follows. On December 19, 2006, Boston police Officers Bryan Ball and Dennis Medina, both of the anti-crime unit, went to the Dorchester District Courthouse expecting to testify. Through the glass front door and glass front wall panels of the courthouse, they saw a group of young men inside the courthouse foyer (but outside the security screening checkpoint) engaged in a disturbance. Two detectives were already inside the courthouse attempting to keep the angry, boisterous group from erupting into violence. Indeed, one of the detectives informed Officer Ball that there had been a fight earlier. Officer Ball recognized one of the young men in the foyer as Meshach Golston. Golston was standing by himself, while the remaining young men were

---

[4]Defendant Elysee also challenges the sufficiency of the evidence to support his probation revocation, and the decision to hold his revocation hearing at the same time as Davis's probable cause hearing.

taunting and yelling angrily at him, saying things like "We got you. We got you." Golston appeared to be very distressed.

Officer Ball was aware that there had been numerous incidents of violence inside and in the immediate vicinity of the Dorchester District Courthouse as well as recent shootings outside the courthouse. He had made arrests for affrays in the courthouse and shootings outside it. Officer Ball knew Golston to be associated with the Lucerne Street gang, to have been very involved in gang activity, and to have been previously arrested for a firearm offense. Officer Ball recognized some members of the group confronting Golston to be members of the Morse Street gang, which Officer Ball knew to be engaged in an ongoing violent feud with the Lucerne Street gang. Officer Ball was aware that some members of the Morse Street group had been arrested for firearms offenses, and that Boston police had received many reports of shootings and firearms violations by members of this group.

Fearing violence, and concerned that Golston's presence was inflaming the members of the Morse Street gang, Officer Ball approached Golston and asked whether he had any business there. Golston said no. Officer Ball told him to leave and, after swearing at Officer Ball, Golston did so. As Officer Ball left the foyer to talk with Officer Medina in front of the building, he saw Golston walk across Washington Street to a store opposite the courthouse. Golston paced back and forth in front of the store, and then returned across the street to the courthouse where he told Officer Ball that he was waiting for his cousin, Dean Tubberville, and that earlier he had been jumped by the Morse Street group inside the courthouse.

Officer Ball had had dealings with and knew Dean Tubberville. He knew that Tubberville had a history of firearms charges. Officer Ball testified that, so far as he knew, Tubberville was not a member of a gang. After Tubberville came out of the courthouse, he and Golston had an excited, emphatic, and animated conversation. Golston and Tubberville then walked back across Washington Street and stood in front of the store. At this point, some members of the Morse Street group came out of the courthouse.

Officer Ball called his sergeant and Boston police Officers

Ismael Henriquez and Joel Resil of the anti-crime unit to express his concern that serious violence would erupt between the members of the two groups. Officer Henriquez was familiar with the Lucerne Street gang. He knew that they had been involved with numerous shootings, drug offenses, and violent crimes, and that they were involved in a conflict with the Morse Street gang. Officer Henriquez also knew Golston personally, through several field interrogations that he had conducted. He knew that Golston had a pending gun charge, that he may have been a victim of a shooting, and that he was usually seen with members of the Lucerne Street gang. Officer Henriquez had also observed and questioned Tubberville in the course of his police work. Officer Resil similarly knew both Golston and Tubberville.

Officers Henriquez and Resil were in an unmarked anti-crime unit car not far away, so Officer Ball asked them to provide assistance at the courthouse. They drove to Wheatland Avenue and stopped a block or so down the street from the intersection of Wheatland Avenue and Washington Street. Meanwhile, Officer Ball watched as Golston and Tubberville were picked up by a black Mercedes sports utility vehicle (SUV) that had come down Wheatland Avenue. The Mercedes made a right turn onto Washington Street without using a turn signal, and headed outbound toward Codman Square, an area known for frequent firearms and drug offenses. Officer Ball asked Officer Henriquez to stop the SUV for the turn signal infraction.

Officers Henriquez and Resil had seen the SUV driving on Wheatland Avenue, but did not notice whether it had signaled when it turned onto Washington Street. Relying on what Officer Ball reported, they followed the SUV. They observed it make a right turn onto Aspinwall Road, this time using a turn signal. Officers Henriquez and Resil then signaled the SUV to stop and it promptly complied. The officers exited their car and approached the vehicle — Henriquez walked to the driver's side of the SUV and Officer Resil walked to the passenger side. As the officers approached, they noticed the rear of the SUV rocking, indicative of movement by the occupants. The officers suspected that one or more of the occupants was trying to conceal something.

Because the SUV's windows were heavily tinted, the officers for their own safety ordered the occupants to lower all the windows. They discovered five people in the SUV: Golston in the front passenger seat; Tubberville in the right rear seat; defendant Ferndy Elysee in the center rear seat; defendant Richard Davis in the left rear seat; and Jazzlyn Walker, the driver. Officer Henriquez recognized Elysee as having previously been arrested for a firearm offense, and also believed that he had been a shooting victim. Officer Resil similarly associated Elysee with a history of firearm violence, and had also briefly dealt with Davis in the past, though not as much as with either Tubberville or Elysee.

Walker informed Officer Henriquez that although she had a driver's license, she did not have it with her. Officer Henriquez returned to his car to check on the driver and vehicle information; to perform a warrant check on all the occupants; and, in light of the number of people in the SUV, the circumstances of the altercation at the courthouse, the known history of passengers in the SUV with firearms, and the fact that only he and his partner were on the scene, to ask for backup. Officer Resil positioned himself at the rear of the SUV. As a result of the earlier events at the courthouse and their personal knowledge about at least three of the five occupants, the officers had developed concern for their safety. Officer Henriquez thus decided to wait for backup before returning to the SUV. Officers Lakenya Webster and Roland Sandefur soon arrived on the scene.

Officer Henriquez once again approached the driver's side of the SUV while Officer Resil returned to the passenger side. The officers noticed that none of the occupants were wearing seatbelts. Officer Henriquez asked Davis, seated in the left rear seat, for his name and date of birth. Davis did not look at the officer, but kept looking straight ahead. He did not answer. The officer asked him a second time, after which Davis did respond with his name and date of birth. The officer then asked him for identification, and Davis said he had none. At this point, Golston interjected, stating that Davis did, in fact, have some identification, and Davis produced it to Officer Henriquez. Officer Henriquez then asked Davis if he was carrying any weapons,

but Davis again did not answer. Officer Henriquez asked him a second time. This time, Davis stated that he was not.

At that point, Officer Henriquez ordered Davis out of the SUV for a weapons frisk. Although he told only Davis to get out, Elysee slid to the left and also started to exit the vehicle. Just as Officer Henriquez started to frisk Davis, Officer Sandefur yelled "gun." Officers Henriquez and Resil saw a handgun on the floor of the SUV where Davis's feet had been. Officer Sandefur grabbed the gun, and the remaining occupants were ordered out. The officers handcuffed the four men; they lacked a fifth pair of handcuffs for Walker. Officer Webster performed a preliminary search of the SUV for additional weapons and found a second handgun beneath and between the left rear seat and the center rear seat.

## B.

As a matter of Federal constitutional law, no justification is required under the Fourth Amendment in order for police to order that the driver and passengers of a motor vehicle exit the vehicle during the course of a lawful stop of the vehicle for a traffic violation like the one at issue here. See *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977) (per curiam); *Maryland* v. *Wilson*, 519 U.S. 408 (1997). In *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), the United States Supreme Court reasoned that the driver of a car lawfully pulled over for a traffic stop is already "stopped." *Id.* at 111. It balanced the further intrusion of requiring the driver to exit the vehicle, which it found "de minimis," against the interest in officer safety, which it found "legitimate and weighty," and concluded that exit orders were reasonable within the meaning of the Fourth Amendment and therefore permissible. *Id.* at 110-111. This reasoning was extended in *Maryland* v. *Wilson*, 519 U.S. 408 (1997), to motor vehicle passengers. *Id.* at 415. The Court concluded that, "as a practical matter," they, too, were lawfully "stopped" in these circumstances, but that the intrusion on them wrought by an exit order is "minimal," and that the risk to an officer from a car with a driver and passengers is greater than that from a car with only a driver. *Id.* at 413-415. Again balancing the state interest against the intrusion, the Court concluded that routine exit orders as to

passengers in such circumstances are reasonable within the meaning of the Fourth Amendment and therefore they, too, are permissible. *Ibid.*

The Supreme Judicial Court has concluded that Massachusetts constitutional law differs. Construing the language of art. 14 of the Massachusetts Declaration of Rights, the Supreme Judicial Court concluded in *Commonwealth* v. *Gonsalves*, 429 Mass. 658 (1999), that exit orders during routine, lawful stops for ordinary traffic violations must be justified.[5] The court reasoned that the intrusion upon the driver or passenger ordered to exit the vehicle "is not minimal," *id.* at 663, and that a rule permitting exit orders at an officer's discretion is an "invitation to discriminatory enforcement of the rule." *Id.* at 664. The court also concluded that the safety of the police could be protected by tailoring the justification required to the circumstance. *Id.* at 662-663. The court thus stated that an exit order is justified where the police have "a reasonable belief that the officer's safety, or the safety of others, is in danger." *Id.* at 663. "Reasonable belief" is shorthand for a reasonable, articulable suspicion. See, e.g., *Commonwealth* v. *Brown*, 75 Mass. App. Ct. 528, 531-532 (2009). See also *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968) ("in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). What is required thus are "specific and articulable facts," from which "a reasonably prudent [person] in the [officer's] position would be warranted" in the suspicion that his or her safety, or the safety of others, is in danger. *Commonwealth* v. *Gonsalves*, *supra* at 661, 664.

This test reflects the rule that the required justification for governmental actions that implicate art. 14 must be tailored to the level of intrusion at issue; the intrusion must be proportional to the danger identified by the officer. See *Commonwealth* v. *Williams*, 422 Mass. 111, 115-116 (1996). Thus, "[t]o support an order to a passenger to alight from a vehicle stopped for a

---

[5]We find no error in the motion judge's conclusion that the stop of the SUV was justified by probable cause that a traffic violation had been committed, see *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995), nor has that point been meaningfully challenged by the defendants in this appeal.

traffic violation . . . the officer need not point to specific facts that the occupants are 'armed and dangerous.' Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." *Commonwealth v. Stampley*, 437 Mass. 323, 326 (2002), quoting from *Commonwealth* v. *Gonsalves*, *supra* at 665.

## C.

In the totality of the circumstances, there was sufficient justification under this standard for the exit order in this case. First, the SUV had picked up Golston, a member of the Lucerne Street gang, who, while alone, had been acrimoniously confronted and perhaps jumped by a group of members of the rival Morse Street gang, with which the Lucerne Street group was involved in a violent feud. Golston and Tubberville, who had joined him, were picked up in a location outside the Dorchester courthouse where shootings (which might well be reasonably thought often to be related to individual's plans to testify or to retribution for criminal acts) frequently occur. There was no indication that the immediate dispute between the two gangs, which had led to at least one altercation involving Golston that day, had been resolved.

While gang membership alone does not provide reasonable suspicion that an individual is a threat to the safety of an officer or another, the police are not required to blind themselves to the significance of either gang membership or the circumstances in which they encounter gang members, which are all part of the totality of the circumstances they confront and must assess. See *Commonwealth* v. *Heon*, 44 Mass. App. Ct. 254, 256 (1998). Furthermore, Golston, Tubberville, and Elysee were all known to have previous firearms arrests.[6] While knowledge of an arrest

---

[6]Because we need not rely on the fact that occupants of the vehicles were known to the officers to have previously been the victims of shootings we need not determine when having been a victim of crime can itself lend support to a finding that an officer's suspicion is reasonable, nor need we determine whether the known details about the previous shootings here were sufficient to cast suspicion on the victims.

and an indictment or conviction — something not shown on this record — would provide a stronger basis for a belief in prior possession of firearms, see, e.g., *Commonwealth* v. *Ciaramitaro,* 26 Mass. App. Ct. 110, 115 (1988), these arrests are one factor that may be considered by police in assessing the circumstances confronting them. See, e.g., *Commonwealth* v. *Gomes,* 453 Mass. 506, 511 (2009) (defendant's previous arrest on drug charges was a factor properly considered in determining whether there was reasonable suspicion defendant was engaged in "drug activity").

Most importantly, after the SUV was pulled over, and while the police were approaching it, they observed it rocking in a manner consistent with significant movement by the SUV's occupants. Given the timing of this, it was reasonable for the officers to conclude that this indicated concealment of something, most likely, given the circumstances, a weapon. In the circumstances, this indicated some risk to safety. Davis's failure when asked to identify himself, to look at Officer Henriquez, or to answer, and his lying when asked if he had identification, could appropriately have served to bolster the officers' suspicion that indeed some contraband, most likely a weapon, was somewhere in the vehicle.[7]

Even with an SUV's windows down, neither its occupants nor its contents are fully visible to an officer standing outside. Approaching an occupied vehicle that is lawfully stopped for a traffic violation may be dangerous and give rise to legitimate concern for officer safety. Police doing so are not required to take unreasonable risks. An exit order is a real but limited intrusion on the occupants that allows the officers both to observe the occupants more fully, and to separate them from the contents of the vehicle, if any. In this case, the evidence of concealment, when combined with the circumstances surrounding Golston and Tubberville's entry into the SUV, the officers' knowledge about three of the five individuals in the SUV, and Davis's

---

[7]Because of the surrounding circumstances, this case is thus unlike *Commonwealth* v. *Martin,* 457 Mass. 14, 20 (2010), in which the silence of a defendant in response to a police officer's question about weapons during a consensual on-the-street encounter was held not to have, by itself, given rise to reasonable suspicion of a threat to officer safety.

responses to the questions about his identification, warranted the officers in a reasonable suspicion that they were confronted with sufficient danger to justify the intrusion inherent in Officer Henriquez's exit order.[8]

The defendants also argue that the exit order was improper because both the exit order and Officer Henriquez's conversation with Davis that immediately preceded it came not when the police initially approached the vehicle, but only after the police had reached the outer boundary of the seizure permitted as part of a routine traffic stop. They argue that, even had police developed reasonable suspicion sufficient to justify an exit order, the officers should instead have allowed the SUV to be on its way, and that the gun must therefore be suppressed as the fruit of a poisonous tree.

As a matter of Massachusetts law under art. 14 of the Massachusetts Declaration of Rights, a police officer may not, without some additional justification, extend a routine traffic stop by questioning a passenger once the driver has produced a valid license and registration. See *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997).[9] "[T]he officer, ordinarily, may issue a citation for the traffic offense and must then allow the car to continue on its way." *Commonwealth* v. *Alvarez*, 44 Mass. App. Ct. 531, 534 (1998).

In this case, however, the motion judge credited Officer Henriquez's testimony that upon returning to the SUV with the

___

[8]Here, the weapon came into plain view as soon as Davis exited the vehicle. Because the incomplete pat frisk, therefore, played no role in the discovery of the firearm, and is, in any event, not challenged by the defendants, we need not, and do not, decide whether the facts were sufficient to justify a pat frisk. Cf. *Commonwealth* v. *Martin, supra* at 19-20. That the officer harbored a subjective intent to perform a pat frisk at the time of the exit order is irrelevant to our determination of the propriety of the exit order. See *Commonwealth* v. *Tremblay*, 48 Mass. App. Ct. 454, 461-462 (2000), quoting from *Whren* v. *United States*, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" [emphasis in original]).

[9]The United States Supreme Court has not articulated the same restriction as a matter of Federal constitutional law. Cf. *Berkemer* v. *McCarty*, 468 U.S. 420, 439-440 (1984) (noting that, in a routine traffic stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). See also *Illinois* v. *Caballes*, 543 U.S. 405, 421 n.3 (2005) (Ginsburg, J., dissenting).

driver's citation he became aware that none of the vehicle's passengers were wearing seatbelts. It was thus permissible for the officers to extend the stop and for Officer Henriquez to ask Davis for identification in order to write a citation for this infraction. See G. L. c. 90, § 13A; *Commonwealth* v. *Goewey*, 69 Mass. App. Ct. 429, 433-434 (2007), *S.C.*, 452 Mass. 399 (2008) (a police officer is justified in requesting identification from a passenger during a traffic stop to enable him to write a citation for a seatbelt infraction). It was during the pendency of *that* encounter that Davis's delayed and false responses to Officer Henriquez's questions about his identity led the officer to act upon his reasonable suspicion that his safety was at risk. Officer Henriquez was thus justified, even before issuing an exit order, in asking Davis whether he had a weapon, and he acted both reasonably and proportionally in issuing his exit order when Davis's response to his question was delayed. Cf. *Commonwealth* v. *Feyenord*, 445 Mass. 72, 77-78 (2005), cert. denied, 546 U.S. 1187 (2006); *Commonwealth* v. *Watts*, 74 Mass. App. Ct. 514, 517-519 (2009).

## II.

Elysee filed a pretrial motion pursuant to Mass.R.Crim.P. 9(d), 378 Mass. 860 (1979), seeking to sever his trial from that of his codefendant. That motion was denied. "Absent a constitutional requirement for severance, joinder and severance are matters committed to the sound discretion of the trial judge." *Commonwealth* v. *McAfee*, 430 Mass. 483, 485 (1999). That discretion must yield only "when the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Moran*, 387 Mass. 644, 658 (1982). Compelling prejudice arises when the defenses asserted at trial are mutually antagonistic and irreconcilable, not merely incompatible. See *Commonwealth* v. *Vallejo*, 455 Mass. 72, 86-88 (2009). Severance is thus discretionary unless "[t]he only realistic escape for either defendant [is] to blame the other." *Commonwealth* v. *Moran, supra* at 659.

The denial of severance was proper, as the defenses asserted at trial were not mutually antagonistic in the way required before severance becomes mandatory. "Such 'mutual antagonism' only

exists where the acceptance of one party's defense will preclude the acquittal of the other." *Id.* at 657, quoting from *United States* v. *Ziperstein,* 601 F.2d 281, 285 (7th Cir. 1979), cert. denied, 444 U.S. 1031 (1980).

On appeal, we make this determination on the basis of the defenses actually presented below. See *Commonwealth* v. *Vallejo, supra* at 88, quoting from Smith, Criminal Practice and Procedure § 20.31, at 188 & n.5 (3d ed. 2007 & Supp. 2008) ("The true level of alleged antagonism between the defenses is measured, on appeal, by the evidence actually at trial"). Contrary to Elysee's assertion on appeal, the defense strategies employed in this case were in many ways harmonious: both defendants attempted to plant a seed of doubt in the jurors' minds by highlighting the myriad alternative explanations for the presence of the weapons. Cf. *Commonwealth* v. *McAfee, supra* at 486, quoting from *Commonwealth* v. *Smith,* 418 Mass. 120, 126 (1994) (severance not warranted where both defendants attacked the credibility of an eyewitness, "thereby indicating that they 'shared a common approach to raising a reasonable doubt' about their guilt in the jury's minds"). Both defendants argued that any of the other passengers, or the vehicle's owner, might have possessed the gun. Indeed, both defendants argued persuasively that the most likely source of both guns was Tubberville, whose fingerprints were found on the magazine of the gun found closest to Elysee, and who had pled guilty prior to trial. In the absence of irreconcilable, mutually antagonistic defenses, the denial of the defendant's motion to sever was not an abuse of discretion.[10]

## III.

Next, at the close of the Commonwealth's case both defendants moved for a required finding of not guilty on all charges at

---

[10]Elysee also contends that he was entitled to severance at his probation revocation proceeding, which was held at the same time as a probable cause hearing for Davis. Even assuming that severance may be required in some circumstances at probation revocation proceedings, which are not part of the criminal process, *Gagnon* v. *Scarpelli,* 411 U.S. 778, 782 (1973); *Commonwealth* v. *Durling,* 407 Mass. 108, 112 (1990), a question we do not decide, Elysee's argument is unavailing. Both defendants articulated substantially the same defense at the hearing in question as they did at trial. Elysee is thus incapable of demonstrating that joinder was an abuse of discretion.

issue in this appeal. Although stated in general terms, each defendant primarily asserted that the evidence of constructive possession, an essential element of each offense, was insufficient as a matter of law. Those motions were denied. We review the denial of the motions for required findings of not guilty to determine whether, after viewing the evidence in the light most favorable to the Commonwealth, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

At trial, the Commonwealth bore the burden of proving, with respect to each offense, that each defendant had "knowledge [of the weapon] coupled with the ability and intention to exercise dominion and control." *Commonwealth* v. *Rosa*, 17 Mass. App. Ct. 495, 498 (1984). Although the elements of constructive possession may be proven entirely by reasonable inferences from circumstantial evidence, see *Commonwealth* v. *Cromwell*, 56 Mass. App. Ct. 436, 438 (2002), mere presence in the area of contraband, without more, is insufficient to prove constructive possession. See *Commonwealth* v. *Gonzalez*, 452 Mass. 142, 147 (2008). "Rather, presence must be 'supplemented by other incriminating evidence, [which] "will serve to tip the scale in favor of sufficiency." ' " *Commonwealth* v. *Pimentel*, 73 Mass. App. Ct. 777, 780 (2009), quoting from *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 410 (1989).

The evidence in this case, viewed in the light most favorable to the Commonwealth, was sufficient to support the finding of constructive possession beyond a reasonable doubt with respect to each defendant. The inferences drawn by the jury need only be reasonable, not necessary. Based on the evidence admitted at trial, the jury would have been warranted in finding that the gun at Davis's feet was in plain view to him, that it was in an area over which he had immediate, though not necessarily exclusive, control, cf. *Commonwealth* v. *Daley*, 423 Mass. 747, 752 (1996) ("Knowledge may be inferred when the contraband is found in plain view in an area over which the defendant has control"); *Commonwealth* v. *Cotto*, 69 Mass. App. Ct. 589, 594 (2007), and that his nonresponsive and deceptive interactions with

Officer Henriquez were a product of his consciousness of guilt. Cf. *Alicea* v. *Commonwealth*, 410 Mass. 384, 387-388 (1991); *Commonwealth* v. *Pimentel, supra* at 783.[11] The evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that Davis was in constructive possession of the firearm.

Evidence at trial would have supported a finding that the firearm Elysee was convicted of possessing was found essentially under his seat in the SUV. Even assuming the evidence would not support a conclusion that the firearm was in plain view, or would have been clearly visible to a passenger, viewing the evidence in the light most favorable to the Commonwealth, the jury could have concluded that the firearm's out-of-view placement was explained by the observed rocking of the SUV, which the officers testified originated from the rear seat, and that the firearm had not been hidden prior to the police arriving. Cf. *Commonwealth* v. *Pimentel, supra* at 780 ("scurrying" sounds heard in apartment supported inference that hidden drugs had been in plain view moments before). Elysee's knowledge of the firearm also may be inferred from his particularly close proximity to it. Elysee's attempt to exit the SUV when he was not ordered to also might reasonably have been interpreted by the jury as attempted flight that was indicative of consciousness of guilt — it was indeed argued to the jury as such. See *Commonwealth* v. *Frongillo*, 66 Mass. App. Ct. 677, 683 n.13 (2006) ("we note that when the defendant is present at or near the scene where the contraband is found . . . the behavior of the defendant generally provides a basis upon which the court determines whether there was sufficient evidence relating to possession, including evidence of consciousness of guilt revealed by suspicious movements or actions, attempted flight, and proximity to contraband in plain view or hidden"). The firearm did bear the fingerprint of Tubberville, who pleaded guilty before trial, but the jury was properly instructed that it need not find

---

[11]The evidence at trial was not identical to that presented on the motion to suppress. Prior to trial, the trial judge ordered that the following testimony be excluded at trial: that the area of the arrest was a high crime area, that the police officers knew the defendants, the defendants' prior criminal history and history with firearms, and the defendants' history as gang members. Our assessment of the sufficiency of the evidence is based on the evidence actually admitted at trial.

Elysee's control to have been exclusive. See *Commonwealth* v. *Beverly*, 389 Mass. 866, 870 (1983). The evidence before the jury was sufficient to support a conclusion beyond a reasonable doubt that Elysee constructively possessed the gun.[12]

## IV.

Finally, we find no merit in the defendants' remaining claims of trial error. There was no error in the unobjected-to admission of the testimony of Walker, the vehicle's driver, that the officers were talking to passengers, including Davis, "like they knew them."[13] When read in context, Walker's testimony conveyed only that the conversation between the officers and the defendants was informal. It did not imply the fact of prior bad acts or nefarious association. Cf. *Commonwealth* v. *Allison*, 434 Mass. 670, 683 (2001). The defendants neither objected to the testimony nor did they seek a curative instruction, but since the admission of this testimony was not error, it is irrelevant whether we review for prejudice or for a substantial risk of a miscarriage of justice.[14]

Nor was the prosecutor's assertion in closing argument that

---

[12]For the same reasons, the evidence presented at Elysee's probation revocation hearing, which was nearly identical in all relevant respects to the evidence presented at the motion to suppress described in the text above, was sufficient to support the judge's finding by a preponderance of the evidence that Elysee had violated his probation based on the new offenses.

[13]Walker's full statement is as follows:

"He went back to his car. Then he came — I guess my license and everything was legit. So when he came back to the car, he gave me all my stuff. And that's when he started talking to Juvie [Davis] — yeah, Juvie. There was a cop on both sides of the car. And they started talking to Juvie. And it was — it was like a basic — every — well, I don't know. They were just talking to them like they knew them.

"Like I said, they would — he was just like, What's up? You guys got anything?

"They were like, No.

"Then he's like, Oh, so if we search you, you guys aren't going to have anything?"

[14]Two prior statements by Walker, the second indicating that the officers already knew passengers in the car, were struck, and the trial judge delivered contemporaneous and forceful curative instructions. The defendants do not

Davis was "nervous" during the stop anything other than a fair inference from the evidence. See *Commonwealth* v. *Moran*, 75 Mass. App. Ct. 513, 523-525 (2009). Although no witness used the word "nervous" at trial, the jury heard testimony that the defendant was avoiding eye contact with the officer, not answering the officer's questions, and answering the officer's questions falsely. The prosecutor's inference that this behavior was evidence of nervousness was not unreasonable.

Lastly, Elysee argues that the trial judge reading, over defense counsel's objection, an excerpt of G. L. c. 269, § 10(*a*), in response to a jury request, stating, "[W]hoever knowingly has in his possession or knowingly has under his control in a vehicle a firearm, loaded or unloaded, shall be punished," could have impermissibly confused the jury concerning the elements of constructive possession. This excerpt, though, was just a reiteration of what the judge had said was required at the outset of his instructions on the offense under § 10(*a*). Moreover, after reading this excerpt, the trial judge reiterated there were three elements the Commonwealth was required to prove beyond a reasonable doubt in order for the jury to find the defendants guilty; he urged the jury to listen again to the tape of his instructions, among the most important of which, he said, was the element of possession, including actual and constructive possession; and he reminded the jury that his instructions remained in effect. We see no prejudicial error.

> *Order revoking probation affirmed.*
>
> *Judgments affirmed.*

---

contend that the curative instructions were inadequate, and "[w]e presume that a jury follow all instructions given to it." *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997).