COMMONWEALTH vs. MARK D. TREMBLAY.

No. 08-P-1618.

Middlesex. December 10, 2009. - August 5, 2010.

Present: LENK, DUFFLY, & McHUGH, JJ.

Further appellate review granted, 458 Mass. 1106 (2010).

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement.

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress statements made to a State police trooper during an interview, where the only basis on which it would be possible to conclude that the statements were given involuntarily was that they were made after the trooper told the defendant that he could speak "off the record," and even viewing the trooper's assurance as an exercise in police deception or trickery, the statements were voluntary in light of the totality of the circumstances. [323-326]

INDICTMENTS found and returned in the Superior Court Department on June 27, 2002.

A pretrial motion to suppress evidence was heard by *Kenneth J. Fishman*, J., and the cases were tried before *Paul A. Chernoff*, J.

*Robert L. Sheketoff* for the defendant.

*Melissa Weisgold Johnsen*, Assistant District Attorney, for the Commonwealth.

McHUGH, J. On the night of April 27, 2002, a boat parked on a trailer near a lake in Chelmsford was extensively damaged by a fire. Police later determined that the fire had been deliberately set. An investigation led to the indictment of Mark D. Tremblay, the defendant, who was convicted by a Superior Court jury of malicious burning of personal property, damage of property for the purpose of intimidation, and a civil rights violation. On appeal, the defendant claims that the motion judge (who was not the trial judge) improperly denied his motion to suppress certain

oral statements he made to a State trooper "off the record." After careful review of the record, we affirm.

*Background.* In summarizing the pertinent facts, we draw on the judge's findings on the motion to suppress, supplemented by uncontested testimony from the suppression hearing that was implicitly credited by the motion judge. See *Commonwealth* v. *Washington*, 449 Mass. 476, 477 (2007); *Commonwealth* v. *Porter P.*, 73 Mass. App. Ct. 85, 86 (2008), *S.C.*, 456 Mass. 254 (2010). Those sources reveal that in April, 2002, a man we shall call Harold Nelson[1] lived in a house near a lake in Chelmsford. Nelson owned a motor boat that he kept on a trailer parked on his lot. The defendant owned the house next door to Nelson's and, on the evening of April 27, was holding a small party for some friends. At about 11:20 P.M., Nelson's boat suddenly erupted in flames and was extensively damaged.

State Trooper Peter Cummings, who worked with the fire and explosion section of the State fire marshal's office, investigated the case and quickly determined that the fire had been intentionally set. As a result of an interview Cummings conducted on May 8, 2002, the defendant became the investigation's principal target.

At about 4:00 P.M. on May 8, Cummings telephoned the defendant's home and spoke with his wife, explaining that he wanted to speak to the defendant as part of his investigation. In reply, Ms. Tremblay told Cummings that her husband was at a baseball field, and gave Cummings a cellular telephone number where the defendant could be reached. Cummings telephoned the defendant, identified himself, told the defendant why he was calling and said he would like to meet with him. In response, the defendant said that he had been expecting the call.

Cummings asked where and when the defendant would like to meet, and offered to come to the ballfield. The defendant said that he preferred to meet elsewhere, so Cummings suggested the Chelmsford central fire station. They agreed to meet there in five to ten minutes. As planned, Cummings and his colleague, Chelmsford fire investigator Hank Houle, met the defendant at the fire station a few minutes later. The trooper and

___
[1] A pseudonym.

the investigator were in an unmarked vehicle and were dressed casually.

In the conference room at the fire station, Cummings told the defendant that he wanted to discuss the boat fire. Cummings also said that he wanted to obtain a written statement from the defendant, and that he would write the statement in the first person for the defendant's review and signature. The statement, Cummings said, had to contain specifics. Cummings did not tell the defendant that he was a suspect or a target of the investigation. Moreover, having determined that the defendant was not in custody, he did not give the defendant the so-called Miranda warnings.

During the interview, which lasted a little more than one hour, the trooper's demeanor was sympathetic. The defendant, who was fifty years old at the time, was cooperative and appeared relaxed, focused, and coherent. On multiple occasions, he left the conference room to engage in cellular telephone conversations. The interview included small talk, during the course of which the defendant discussed work he had performed moving equipment for professional sports teams and installing "kill" switches in police cruisers. At one point Cummings told the defendant that he could leave to pick up his son and resume the interview later if he wished, but the defendant decided to stay and finish the interview.

At some point, Cummings asked the defendant if he had any idea who might have been responsible for setting fire to Nelson's boat. The defendant responded that he "had his suspicions." When Cummings pressed him to amplify, the defendant said that Cummings probably had heard about the "gay activities" at Nelson's house. Expressing reluctance to describe those activities in writing, the defendant said that he would prefer to discuss them with Cummings "off the record." Cummings said, "Fine, . . . we'll go off the record."

Once "off the record," the defendant, in an agitated narrative during which he used profanities, expressed his anger about "some of the things that he and his wife [had] been subjected to." He then described some activities of Nelson's that he claimed to have witnessed, and ended by saying that that he did not want his son looking at Nelson and his "lovers kissing out in the hot tub" at the back of Nelson's house.

As the motion judge noted, after the defendant finished, he agreed, at Cummings's urging, to include in the written statement "a watered-down description of the so-called 'gay activities,' including the purported sexually explicit conduct that occurred in plain view of the defendant's house." The defendant also agreed to include in the statement his suspicion that the fire "may have been caused by a lover's quarrel" between "same-sex partners" who have "frequent arguments."[2]

The interview ultimately resulted in a five and one-half page

---

[2]The "watered-down" version of the defendant's "off the record" narration consisted of the following three paragraphs:

> "I have no knowledge of who, if anyone, is responsible for [the] fire. I will say, that there are a lot of problems with people who live at [Nelson's house] and people who come and go from that address. In particular, we (my wife and I) overhear arguments frequently between visitors next door. If I had to point authorities in the right direction, I would suggest they look into the activities of visitors to [Nelson's house] regarding this incident.

> "There is [*sic*] multiple gay activities going on at this address. There is a hot-tub on the exterior of the house about 10 feet from my living room window. Openly gay, sexual and explicit activities in plain view can be viewed in this hot tub, on the rear deck, basically anywhere in and around this residence.

> "It is my opinion, given my observation of what occurs in the neighborhood, with multiple same-sex partners and frequent arguments between them, this event may have been caused by a lover's quarrel."

Except for the defendant's expression of anger at Nelson's activities, that "watered-down" version was not materially different from Cummings's testimony at trial about the content of the "off the record" statement the defendant had made:

> "[The defendant] told me that, you know, his son didn't want to stay at the house anymore; that he was concerned about his son's viewing of some of what he described as open homosexual activity going on at the house next door. It was primarily restricted to, you know, the hot tub on the rear deck, you know, things that were more easily observed, I guess, from his house. He told me that he didn't like what was going on next door, that he had a problem with what was going on next door. And when I asked him, if he didn't like what was going on and was angry about what was going on next door, he told me that he was fucking pissed. . . . [H]e told me that [Nelson] was a — was gay, that he didn't approve of it, he didn't like it. You know, that there were always arguments going on next door, you know, various arguments between [Nelson] and some of [Nelson's] lovers. That most of the problems that

handwritten statement that was reviewed by the defendant, Cummings, and Houle. After the defendant signed the statement, Cummings became more confrontational and told the defendant that he did not believe him. Among other things, Cummings asked the defendant about a conversation the defendant had had with Peter Karlson, one of the guests at the defendant's party on the night of the fire, in which the defendant told Karlson that he had changed his shirt during the evening because he had spilled gasoline on himself when he lit the boat on fire. The defendant insisted that he did not know what Cummings was talking about. When Cummings asked if he could see the shirt the defendant had been wearing early on the evening of the fire, the defendant said that he assumed the shirt was at his house and offered to produce it, though he never did.

The interview ended shortly after Cummings asked to see the shirt. As it ended, Cummings told the defendant that he was likely to be indicted for arson, and that "now was the time to start telling the truth." To that, the defendant responded that he had provided all the help he could, and, accompanied by Cummings's valedictory, "Good luck, you're going to need it," he left the fire station.

On June 27, 2002, the defendant was indicted for malicious burning of personal property, in violation of G. L. c. 266, § 5; damage of property for the purpose of intimidation, in violation of G. L. c. 265, § 39; and a civil rights violation under G. L. c. 265, § 37. The defendant filed a motion to suppress the "off the record" statements he had made to Cummings. That motion was denied after an evidentiary hearing. In a thorough and careful memorandum of decision, the motion judge, after canvassing and discussing applicable precedent, found that "[w]hile the defendant was likely misled concerning the ultimate use against him of his more offensive description of his neighbor's alleged sexual preference and conduct, the defendant was voluntarily talking with the investigators before any promise or assurance, and the essence of these comments was voluntarily included in his written statement. Indeed, the fact that the defendant was

occurred next door between [Nelson's] sister and her former husband, or separated husband, I guess, at the time, you know, that many people thought, himself included, were attributed to [Nelson] moving into the house."

sufficiently savvy to ensure that the version which was potentially more harmful to himself was not included in the written statement is another indication of the absence of coercion."

Following a jury trial where the evidence included the "off the record" statements, testimony about the defendant's "off the record" request, and testimony about the kind of language the defendant and his friends used when discussing Nelson and his friends, the defendant was found guilty on all three indictments.[3] On appeal, his sole argument is that the "off the record" statements were involuntary and should not have been introduced at the trial.

*Discussion.* In assessing the defendant's claim, we start with the familiar proposition that a confession or an admission may be admitted as evidence in a criminal trial only if the defendant made the statement voluntarily. See, e.g., *Commonwealth* v. *Sheriff,* 425 Mass. 186, 192 (1997). In turn, the test for voluntariness is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Souza,* 428 Mass. 478, 483-484 (1998), quoting from *Commonwealth* v. *Raymond,* 424 Mass. 382, 395 (1997).

"In evaluating the voluntariness of a defendant's statement, a number of factors are to be considered, including the following: age; education; intelligence; emotional stability; physical and mental condition; conduct of the defendant; who initiated the conversation with the police; experience with and in the criminal justice system; the details of the interrogation, including recitation of Miranda rights; and whether any promises or inducements were made by the police." *Commonwealth* v. *Moran,* 75 Mass. App. Ct. 513, 520 (2009). As we review the motion judge's application of those factors and his ultimate decision, we "accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the

---

[3]Cummings and the defendant both testified about the defendant's "off the record" request and Cummings's response, and, on cross-examination, Cummings testified that he had lied to the defendant when he gave the "off the record" assurance. The jury were instructed in accordance with the "humane practice." See *Commonwealth* v. *Tavares,* 385 Mass. 140, 149-152, cert. denied, 457 U.S. 1137 (1982).

weight and credibility to be given oral testimony presented at the motion hearing. . . . We review independently the application of constitutional principles to the facts found." *Commonwealth* v. *Wilson*, 441 Mass. 390, 393 (2004).

The defendant was fifty years old at the time of questioning, and there is nothing in the record to suggest that he lacked education or intelligence. The record reflects that he was emotionally stable at the time of questioning, and that he had no physical or mental impairments. The defendant's conduct further indicates that the interview was not coercive. He engaged in personal cellular telephone conversations during the interview, and chose to continue the interview, even after he was given the option to leave, pick up his son, and resume later. As the interview progressed, the defendant and the investigators discussed matters other than the boat fire, including the defendant's familiarity with several State troopers he had met while installing equipment in police cruisers. The police in this case initiated the conversation, but they did not arrest the defendant during or immediately after the interview. The defendant does not challenge the motion judge's finding that there was no custodial interrogation and, consequently, does not argue that he should have received Miranda warnings. Thus, the only basis on which one could possibly conclude that the defendant's statements were involuntary is that he made them after Cummings told him that he could speak "off the record."[4]

Even if we view Cummings's assertion that the defendant's statements would be "off the record" as an exercise in police deception or trickery,[5] the exercise does not make the defendant's statements involuntary. To be sure, Massachusetts deci-

---

[4]We note that the statements in question, in which the defendant used profanity to express anger at what he claimed were his neighbor's sexually explicit "gay activities," enhance evidence of a motive for the crime, but the statements do not rise to the level of a confession. The defendant never admitted committing a crime while speaking "off the record," or at any time during the interview. And while the "off the record" statements forcefully demonstrated the defendant's antipathy toward the activities he claimed to have viewed, some of that antipathy percolates through the "watered-down" version of the remarks he ultimately signed.

[5]There is no question that Cummings testified at trial that he had lied to the defendant about his ability to speak "off the record," see note 3, *supra*, but, in assessing the motion judge's decision, we look to the record of the suppression hearing, not the trial. See *Commonwealth* v. *Grandison*, 433 Mass. 135,

sions disapprove of police officers' use of deception as a tactical device, and acknowledge that deception casts doubt on the voluntariness of statements the deception produces. See *Commonwealth* v. *Jackson*, 377 Mass. 319, 328 n.8 (1979). But "[m]isinformation by the police does not necessarily render a confession involuntary." *Commonwealth* v. *Raymond*, 424 Mass. at 395. See *Commonwealth* v. *Edwards*, 420 Mass. 666, 671 (1995) ("trickery alone may not invalidate a waiver [of Miranda rights] if there is evidence, in light of the other surrounding circumstances, that the waiver was made voluntarily"). Particularly in cases such as this, "where the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression." *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 433 (2004).

Some forms of police deception or trickery are more likely than others to result in a finding that a statement is involuntary. For example, cases in which an officer "suggest[ed] broadly that it would be 'better' for a suspect to tell the truth," but then told the defendant "that a confession would 'probably help your defense; in fact, I am sure it would,' " *Commonwealth* v. *Meehan*, 377 Mass. 552, 564-565 (1979); cases where promises of leniency are combined with false statements about "ostensibly irrefutable evidence of guilt," see *Commonwealth* v. *DiGiambattista, supra* at 439; and cases where police use trickery to obtain a waiver after a defendant has exercised his right to remain silent or has requested counsel, see *Commonwealth* v. *Taylor*, 374 Mass. 426, 433 (1978), and *Commonwealth* v. *Jackson, supra* at 325-326, are likely to call into question the voluntariness of everything the defendant thereafter says. Here, however, Cummings never gave the defendant a promise of leniency, either express or implied, nor did he trick the defendant into reversing a decision to remain silent or to request counsel.

If and to the extent that Cummings employed trickery with his "off the record" assurance, then, the case is similar to others in which, given the totality of the circumstances, the deception did

---

137 (2001). The record at the suppression hearing did not require the judge to conclude that Cummings had lied, though, as noted, *supra*, the judge found that the defendant likely had been "misled." Nevertheless, because of Cummings's trial testimony, we proceed as if the suppression record revealed that Cummings had engaged in trickery or deception.

not make the defendant's statements involuntary. Such cases include those in which the court found a defendant's statements to be voluntary although police suggested he should "tell 'his side of the story.' " *Commonwealth* v. *Raymond, supra* at 395-396. See *Commonwealth* v. *LeBeau*, 451 Mass. 244, 256 n.13 (2008). Even in cases where police made more egregiously false statements or falsely implied, for example, that a defendant's fingerprints or handprints were found at a crime scene, the court has found that the defendant's statements were voluntary in light of the totality of the circumstances. See *Commonwealth* v. *Forde*, 392 Mass. 453, 455-456 (1984); *Commonwealth* v. *Selby*, 420 Mass. 656, 664-665 (1995); *Commonwealth* v. *Edwards, supra* at 672. In each case, the question is whether the police conduct coerced the resulting statement, not whether their conduct was congruent with some abstract level of propriety. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 576-577 (2003).

On this record, none of the motion judge's factual findings was clearly erroneous and his legal analysis was correct. There is no basis, therefore, for upsetting his ultimate finding that none of the statements the defendant made to Cummings was involuntary, and the motion to suppress was properly denied.

*Judgments affirmed.*