## COMMONWEALTH *vs.* MARK D. TREMBLAY.

Middlesex. April 4, 2011. - July 20, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement.

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress statements made to a State police trooper during an interview, where the trooper's simple acquiescence to the defendant's request that certain of his comments be "off the record" was not so manipulative or coercive that it deprived the defendant of his ability to make a free and rational choice whether to make such comments in the first instance, and where this fact, together with all the other circumstances surrounding the interview, which did not suggest coerciveness, supported the conclusion that the defendant's off-the-record statements were not involuntary. [205-212] GANTS, J., dissenting, with whom IRELAND, C.J., joined.

INDICTMENTS found and returned in the Superior Court Department on June 27, 2002.

A pretrial motion to suppress evidence was heard by *Kenneth J. Fishman*, J., and the cases were tried before *Paul A. Chernoff*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Robert L. Sheketoff* (*David Yannetti* with him) for the defendant.

*Melissa Weisgold Johnsen*, Assistant District Attorney, for the Commonwealth.

SPINA, J. During the evening of April 27, 2002, a boat owned by a man we shall call Harold Nelson[1] was damaged extensively by fire. Following an investigation by police and fire officials, the defendant, Mark D. Tremblay, was indicted by a grand jury

---

[1] In the interest of privacy, we use the same pseudonym adopted by the Appeals Court. See *Commonwealth* v. *Tremblay*, 77 Mass. App. Ct. 318, 319 & n.1 (2010).

on charges of malicious burning of personal property in viola-
tion of G. L. c. 266, § 5; damage to property for the purpose of
intimidation in violation of G. L. c. 265, § 39; and a civil rights
violation under G. L. c. 265, § 37. The defendant filed a motion
to suppress statements that he made to the police during the
course of their investigation. After a hearing, a judge in the
Superior Court denied the motion, and the case proceeded to
trial. A jury returned guilty verdicts on all three charges. The
Appeals Court affirmed the convictions, concluding that none of
the statements made by the defendant to a State trooper was
involuntary, and, therefore, the motion to suppress was properly
denied. See *Commonwealth* v. *Tremblay*, 77 Mass. App. Ct.
318, 318-319 (2010). We granted the defendant's application for
further appellate review. He now contends that his motion to
suppress should have been allowed because statements that he
made "off the record" during his interview with the State trooper
were not voluntary. For the reasons that follow, we affirm.

1. *Background.* We begin with a summary of the motion
judge's findings, supplemented by uncontroverted testimony
from the suppression hearing that was implicitly credited by the
judge. See *Commonwealth* v. *Washington*, 449 Mass. 476, 477
(2007).

Harold Nelson lived in a home adjacent to a lake in Chelms-
ford. He was the owner of a twenty-foot Bayliner boat. On
April 27, 2002, the boat was atop a trailer on land that was
across the street from where Nelson lived. That evening, the
defendant, who owned a home next door to Nelson, was hosting
a small gathering at his house. At around 11:20 P.M., while Nel-
son was at home in bed, his boat erupted in flames. The fire
caused extensive damage to the vessel, and investigators
concluded that it had been intentionally set.

Trooper Peter Cummings of the State police, who was work-
ing for the fire and explosion investigation section of the State
fire marshal's office, was assigned to assist personnel from the
Chelmsford police and fire departments with their investigation
of the fire. On May 8, 2002, Cummings and Chelmsford fire
investigator Henry Houle conducted interviews with various
individuals, including several who had attended the defendant's
gathering on April 27. Principally as a result of their conversa-

tion with one of the party guests, the defendant became the focus of the investigation.

At around 4 P.M. on May 8, Trooper Cummings telephoned the defendant's residence and spoke with his wife. Cummings identified himself and the purpose of his call, namely, that he wanted to speak with the defendant in connection with the fire investigation. The defendant's wife told Cummings that the defendant was at a ballfield, and she gave him the defendant's cellular telephone number. Cummings proceeded to telephone the defendant, identified himself, and stated the purpose for his call, which the defendant said that he had been expecting. Cummings asked the defendant if there was some place where they could get together to talk about whatever information the defendant could provide, and Cummings offered to drive to the ballfield. The defendant said that he preferred not to meet there because numerous distractions would make conversation difficult. Trooper Cummings suggested, as an alternative, the Chelmsford central fire station, and they agreed to meet at that location in five to ten minutes.

When Cummings and Houle, who were traveling in an unmarked vehicle and were casually dressed, arrived at the fire station, the defendant was already there, waiting in his car. After introductions, the three men went inside the fire station and upstairs to a conference room on the second floor. The room had several windows, two doors (one of which provided access to the roof), and a conference table where the men sat; a section of the room that was used as a bedroom for firefighters was partitioned off from the conference area.

Trooper Cummings again informed the defendant that he was investigating the fire on Nelson's boat, that he was collecting information from several people, and that he wanted to hear about the defendant's activities and observations during the evening of April 27. Cummings told the defendant that he wanted to take a written statement from him, and, assuming that the defendant had no objections, Cummings would write the statement in the first person and then the defendant could review and sign it. Cummings told the defendant that he wanted him to be as specific as possible in his recollections of the evening. Cummings did not tell the defendant that he was a suspect or a

target of the investigation. Moreover, having determined that the defendant was not in custody, Cummings did not advise him of his Miranda rights. The defendant expressed his willingness to cooperate.

During the interview, which lasted a little more than one hour, the demeanor of Trooper Cummings was sympathetic and understanding. He did not yell at or threaten the defendant, and the tone of his voice was conversational. At one point, he closed the windows because of outdoor construction noise, but there was no indication that the room became uncomfortable. The defendant, then approximately fifty years old, appeared relaxed, focused, and coherent. On two or three occasions, he left the conference room to engage in cellular telephone calls. The interview included small talk, and Trooper Cummings told the defendant that if he needed to leave to pick up his son from a ball game, the interview could be continued at a later time. The defendant chose to stay and finish the interview. At no point did he ask to leave.

The defendant first discussed with Cummings and Houle his two jobs, one working for a company that moved equipment for professional sports teams, and the other installing so-called "kill switches" in police cruisers. Houle did not ask the defendant any questions, but, when Cummings left the room for several minutes to answer a page, he did engage the defendant in a brief conversation about his work and about the Red Sox. At some point during the interview, Trooper Cummings asked the defendant if he had any idea who might have been responsible for setting fire to Nelson's boat. The defendant responded that he "had his suspicions." When asked to elaborate, the defendant suggested that Cummings probably had heard about some of the "gay activities" going on at Nelson's house, but the defendant was reluctant to describe those activities for a written statement. Instead, he expressed a preference for having a discussion about Nelson's activities "off the record." Trooper Cummings responded, "Fine, you know, we'll go off the record."[2] Speaking in an increasingly agitated manner and using some

---

[2]According to Trooper Cummings's testimony, he did not explain to the defendant that his "off the record" statements potentially could be used against him in court.

profane language, the defendant proceeded to express his anger about openly sexual conduct purportedly occurring at Nelson's house in plain view of the defendant's home, and about the reluctance of the defendant's son to spend time at their lake house because of those activities. As agreed, Trooper Cummings did not include these particular comments and opinions in the written statement.

The interview ultimately resulted in the production of a five and one-half page written statement consisting largely of nonincriminating recollections and observations of the defendant's own activities during the evening of April 27. Trooper Cummings persuaded the defendant to include in the written statement a "watered-down version" of his "off-the-record" comments about Nelson's so-called "gay activities."[3] The written statement also set forth the defendant's opinion that the fire "may have been caused by a lover's quarrel" between "same-sex partners" who have "frequent arguments between them." The written statement was reviewed by the defendant as Cummings read it aloud, corrections were made and initialed by the defendant, and the statement was signed by the defendant, Cummings, and Houle. The written statement did not include the defendant's "off the record" comments, which the defendant sought to suppress, to the effect that the defendant's son did not want to stay at their lake home any longer because of the sexual activities described in the written statement; that the defendant did not approve of such activities; and that he was "fucking pissed" about what was going on in Nelson's yard.[4]

After the defendant had signed the statement, Trooper Cum-

---

[3]The motion judge asked Trooper Cummings how he persuaded the defendant to go back "on the record" with regard to his feelings about and observations of Nelson. Trooper Cummings testified: "I said words to the effect of, you know, 'I mean, do you want to try — do you want to say anything in writing about, you know, what you've been subjected to? I mean do you think it will do any good that, you know, maybe you're bringing some attention to the fact that, you know, you've been subjected to all of this,' and that he agreed with me and thought that, you know, maybe we should put something in there. Which, I guess, is what you're reading. It's a little bit of a watered down version of what his opinions were."

[4]These oral statements were admitted at trial. Although not specifically described during closing arguments before the motion judge, they were categorically included in the defendant's motion to suppress.

mings became more confrontational and told the defendant that, based on his conversations with several party guests and his examination of the fire scene, he did not believe parts of the defendant's story. Cummings further told the defendant that he would not listen to the defendant's "bullshit" anymore, but that if the defendant wanted to tell the truth, then Cummings would listen. Cummings then asked the defendant about a conversation between the defendant and one of the party guests, during which the defendant allegedly told the guest that he had changed his shirt during the evening of April 27 because he had spilled gasoline on himself. The defendant insisted that he did not know what Cummings was talking about. When asked about the location of the shirt, the defendant said that he assumed it was at his house and offered to produce it, but he never did.

Toward the end of the interview, Trooper Cummings told the defendant that he could be indicted for arson, and that it was time to start telling the truth. The defendant professed that he could provide no further help. Cummings ended the interview by saying to the defendant, "Good luck, you're going to need it." The defendant then left the fire station. Approximately fifteen to twenty minutes had elapsed from the time that the defendant signed the written statement to the time that he walked out of the fire station.

Following a hearing on the defendant's motion to suppress his statements to Trooper Cummings on May 8, 2002, a Superior Court judge denied the motion.[5] The judge first concluded that Trooper Cummings's interview with the defendant was not a custodial interrogation. As such, Cummings was not required to read the defendant the Miranda rights before the defendant made oral or written statements, and those statements did not need to be excluded from evidence on that ground. The judge next concluded, based on the totality of the circumstances, that Trooper Cummings's agreement that certain limited statements by the defendant would be "off the record" did not render those particular statements involuntary. The judge stated that, apart

---

[5]The defendant did not testify at the suppression hearing. Testimony regarding the fire investigation and the circumstances surrounding the May 8, 2002, interview was provided by Trooper Cummings and by Henry Houle, the Chelmsford fire investigator.

from this agreement by Cummings, there were no other factors present that would indicate that the defendant was coerced into making the statements. Further, the judge stated that, although the defendant "was likely misled concerning the ultimate use against him of his more offensive description of his neighbor's alleged sexual preference and conduct," the defendant had been speaking voluntarily with Trooper Cummings before any promise or assurance was made, and he agreed to have the essence of his comments included in his written statement. Indeed, the judge continued, the fact that the defendant was "sufficiently savvy to ensure that the version which was potentially more harmful to [the defendant] was not included in the written statement [was] another indication of the absence of coercion." Accordingly, all of the oral and written statements made by the defendant to Trooper Cummings on May 8 were deemed admissible.

2. *Discussion.* When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error. See *Commonwealth* v. *Gomes*, 453 Mass. 506, 508-509 (2009); *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). We make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). Questions of credibility are the province of the motion judge who had the opportunity to observe the witnesses. See *Commonwealth* v. *Martin*, 447 Mass. 274, 280 (2006). Our review here is based on the facts as developed at the suppression hearing, not at trial. See *Commonwealth* v. *Grandison*, 433 Mass. 135, 137 (2001).

We begin our analysis by pointing out that the present case is not one that is governed by *Miranda* v. *Arizona*, 384 U.S. 436 (1966) (*Miranda*). In that case, the United States Supreme Court established a "prophylactic" mechanism, see *New York* v. *Quarles*, 467 U.S. 649, 653 (1984), for safeguarding the privilege against self-incrimination afforded by the Fifth Amendment to the United States Constitution to an individual who is subjected to custodial police interrogation. See *Miranda*, *supra* at 444. The Court's primary impetus for establishing the Miranda warnings was its concern that the coercive atmosphere

created by police custody and interrogation would "subjugate the individual to the will of his examiner," wholly undermining the exercise of free and rational choice and jeopardizing the privilege against self-incrimination. *Id.* at 457-458. See *Commonwealth* v. *Simon*, 456 Mass. 280, 286, cert. denied, 131 S. Ct. 181 (2010). To protect an individual from such presumptive coercion, the Supreme Court concluded that unless the individual was given specific warnings prior to making any statements during a custodial interrogation, those statements would not be admissible at trial. See *Miranda, supra* at 467, 476. See also *Commonwealth* v. *Simon, supra.*

Here, the defendant has not challenged the judge's finding that he was not in custody while he was being interviewed by Trooper Cummings, and, therefore, no Miranda warnings were required. The defendant's sole contention on appeal is that his motion to suppress should have been allowed because Trooper Cummings's representation to the defendant that certain statements would be "off the record" rendered those statements involuntary. In the defendant's view, Cummings's representation was the functional equivalent of telling the defendant that what he said would not be used against him, thereby providing an impetus for the defendant to express his anger at and negative feelings for Nelson. We conclude that, in the particular circumstances of this case, the judge properly denied the defendant's motion to suppress.

It is well established that a confession or an admission is admissible in evidence only if it is made voluntarily. See *Commonwealth* v. *Sheriff*, 425 Mass. 186, 192 (1997). At a suppression hearing, a defendant's statement initially is presumed to be voluntary, placing the burden on the defendant to produce evidence tending to show otherwise. See *Commonwealth* v. *Hilton*, 450 Mass. 173, 177 (2007); *Commonwealth* v. *Harris*, 371 Mass. 462, 471 n.3 (1976). See also *Commonwealth* v. *Crawford*, 429 Mass. 60, 65 (1999). Where such evidence is forthcoming, through a motion and affidavit or a proffer, the presumption disappears, and the Commonwealth then bears the burden of proving beyond a reasonable doubt that the statement was made voluntarily. See *Commonwealth* v. *Hilton, supra*; *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 439 (2004); *Com-*

*monwealth* v. *Crawford, supra* at 64-65; *Commonwealth* v. *Tavares*, 385 Mass. 140, 151-152, cert. denied, 457 U.S. 1137 (1982). See also J.A. Grasso & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 18-9[d], at 18-85 (2010).

"The test for voluntariness . . . is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.' " *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998), quoting *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997). A voluntary statement is one that "is the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion." *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001). See *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000); *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). "Under this 'totality of the circumstances' test, we consider all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant." *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). See *Commonwealth* v. *Hilton, supra*; *Commonwealth* v. *Parker*, 402 Mass. 333, 340 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995). Relevant factors include, but are not limited to, "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). See *Commonwealth* v. *Selby, supra*. "The presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntary." *Commonwealth* v. *Selby, supra* at 664.

The motion judge found that, at the time of the defendant's statements to Trooper Cummings on May 8, 2002, the defendant was a fifty year old man, involved in two businesses, in apparent good mental and physical condition, and unimpaired by alcohol or drugs. There is nothing in the record to suggest that he lacked education or intelligence. The defendant periodically

engaged in cellular telephone calls during the course of the interview, and he chose to stay and finish the interview, even after being given the option to leave and continue at a later time. The judge stated that there was no credible evidence that the defendant had had any experience with the criminal justice system that would have prepared him for his encounter with law enforcement officials on May 8, but the judge found that the manner and place of "interrogation" were not overtly coercive. The judge stated that the only questionable tactic by Trooper Cummings was his agreement to the defendant's request that a limited portion of the defendant's oral statements be "off the record." We turn now to the import of that agreement on the defendant's subsequent statements and whether it rendered them involuntary.

As a general matter, law enforcement officials must exercise caution when employing deception or trickery or when giving assurances to a suspect during an interrogation. With respect to the former, we have, over the years, expressed our disapproval of police tactics that employ the use of false statements during an interrogation because such tactics cast doubt on the voluntariness of any subsequent confession or admission. See *Commonwealth* v. *DiGiambattista, supra* at 432, and cases cited. Nonetheless, we also have repeatedly held that such deception or trickery does not necessarily compel suppression of the confession or admission but, instead, is one factor to be considered in a totality of the circumstances analysis. See *id.* at 432-433. See also *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995) (use of false information by police to elicit incriminating statements from defendant is relevant factor in determining whether statements were made involuntarily in violation of due process). In those cases where "the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression, but . . . if the circumstances contain additional indicia suggesting involuntariness, suppression will be required" (emphasis in original). *Commonwealth* v. *DiGiambattista, supra* at 433. Compare *Commonwealth* v. *Selby, supra* at 663-665 (where use of false information by detectives, in effort to elicit incriminating statements from defendant, was only factor suggesting alleged coercion, defendant's statements

held voluntary in totality of circumstances and, therefore, not suppressed), with *Commonwealth* v. *Meehan*, 377 Mass. 552, 563, 567-568 (1979), cert. dismissed, 445 U.S. 39 (1980) (communication of misinformation about strength of Commonwealth's case, taken alone, not sufficient to establish involuntariness, but presence of other factors suggesting possible coercion will result in suppression of inculpatory statements).

In a distinct but related vein, assurances made by the police to a suspect for the purpose of securing a confession or admission may render the suspect's statements involuntary. Such assurances frequently arise in the context of a suggestion by the police that the defense would benefit from a confession. See *Commonwealth* v. *Meehan, supra* at 563-564. "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." (Footnotes omitted.) *Id.* at 564. See *Commonwealth* v. *O'Brian*, 445 Mass. 720, 727-728, cert. denied, 549 U.S. 898 (2006) (where, among other factors, detective stopped short of making assurances to defendant about benefits of confessing, defendant's statement deemed voluntary, not coerced); *Commonwealth* v. *Raymond*, 424 Mass. 382, 395-396 (1997) (statement by police officer that it would be in defendant's best interest to tell "his side of the story" did not constitute coercion that overrode will of defendant and rendered confession involuntary); *Commonwealth* v. *Mandile*, 397 Mass. 410, 414-415 (1986) (statements not induced by assurances of protection or leniency deemed voluntary); *Commonwealth* v. *Fournier*, 372 Mass. 346, 348-349 (1977) (good faith promise by police officer not to disclose defendant's statement to particular patrolman was not inducement to confess because promise "merely limited the use to be made of the statement the defendant was ready to make"). Contrast *Commonwealth* v. *Novo*, 442 Mass. 262, 267-269 (2004) (misrepresentation of defendant's right to defend himself at trial, by officer's incessantly repeated statement that defendant must tell

his side of story "now-or-never," irretrievably tainted defendant's subsequent confession, rendering it involuntary).

Trooper Cummings's statement to the defendant that they could go "off the record" to discuss the defendant's opinions about Nelson is not one that fits squarely within the purview of either engaging in trickery or making assurances that a statement will benefit the defense. As to the former, Cummings simply was acquiescing to the defendant's request that certain of his comments not be included in the written statement that Cummings was preparing with the defendant's agreement and cooperation. By not including those comments in the written statement, Cummings fulfilled his promise to the defendant and, therefore, did not engage in trickery or deception.[6] As to the latter, Trooper Cummings never gave the defendant any assurances of protection, leniency, or the like. Nonetheless, given that Cummings told the defendant that they could go "off the record" for a portion of their interview, we consider whether certain of the defendant's statements were involuntary because he could have believed that his "off the record" comments would not be used against him, and, therefore, he was free to say whatever he wanted.

The focus of our inquiry is on coercion because that is the hallmark of an involuntary statement. As we have emphasized, we examine whether the defendant's will was overborne to the extent that his "off the record" statements were not the result of a rational and voluntary act, and our decision is based on the totality of the circumstances surrounding Trooper Cummings's interview with the defendant. See *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998); *Commonwealth* v. *Raymond, supra.* This is not an area of the law that is governed by bright-line rules, but is one that requires a fact-intensive analysis. We recognize that a slightly different factual scenario from the one presented here could result in a different outcome.[7] Nonetheless,

---

[6]At the suppression hearing, defense counsel stated that he did not contend that Trooper Cummings was trying to trick the defendant or was acting with malice.

[7]See, e.g., *United States* v. *Walton*, 10 F.3d 1024, 1028-1032 (3d Cir. 1993) (agent's statement to suspect that he could tell agent what had happened "off the cuff," coupled with agent's reference to prior relationship with suspect as

Commonwealth *v.* Tremblay.

we decide the case before us, not one that may arise in the future with other factual variables.

Here, after expressing his reluctance to have his opinions about Nelson's activities included in the written statement, the defendant asked that those comments be "off the record." Trooper Cummings acquiesced. The transcript of the suppression hearing does not suggest that Cummings pressured or otherwise coerced the defendant into making incriminating statements by indicating that they would be "off the record."[8] Further, we do not conclude that Trooper Cummings's representation, by itself, was inherently coercive as a matter of law given that our analysis is based on a totality of the factual circumstances.[9] Once he had expressed his blunt opinions about Nelson's activities, the defendant then went back "on the record" by agreeing to have a "watered-down version" of his comments included in the written statement. As such, the written statement contained nothing that was "off the record," and there is no evidence of

basis for inviting suspect to confide in agent, agent's promise to suspect that statements were not going to be used against him, and agent's provision of Miranda rights to suspect on previous day, rendered suspect's confession involuntary and, therefore, inadmissible).

[8]Contrary to the assertion in the dissent, Trooper Cummings never agreed not to testify at trial regarding what the defendant said "off the record," and Cummings never made any promises to the defendant that his "off the record" statements would not be used against him.

[9]The dissent proposes that we should reach just such a conclusion — that Trooper Cummings's representation is inherently coercive and, consequently, it alone suffices to render the defendant's "off the record" comments involuntary. This position contradicts the dissent's acknowledged agreement with the court that the voluntariness of the defendant's "off-the-record" statements is based on a totality of the circumstances. The import of the dissent is that the factual circumstances surrounding a police interrogation become wholly irrelevant because a single action by an officer, here, a statement that a particular discussion could be "off the record," is deemed inherently coercive, thereby rendering a defendant's subsequent statements involuntary. No longer would we consider all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant. Instead, one factor, albeit one that has the *potential* to render subsequent statements involuntary, becomes dispositive, to the exclusion of all else. That is not, and never has been, our jurisprudence with regard to testing the voluntariness of a defendant's statements to police. The effect of the dissent is a wholesale erosion of our totality of the circumstances analysis, one that has provided a fair, clear, and workable framework for evaluating the myriad circumstances that can, and do, arise during a police interrogation.

police coercion with regard to the defendant's decision to include the "watered-down version" of his comments in the written statement. The defendant was perfectly free to exclude his "off-the-record" comments from the written statement, to make changes to the written statement when he reviewed it, or to refuse to sign it altogether.

With respect to the few oral statements that remained "off the record," Trooper Cummings's simple acquiescence to the defendant's request that certain of his comments be "off the record" was not so manipulative or coercive that it deprived the defendant of his ability to make a free and rational choice about whether to make such comments in the first instance. This fact, together with all the other circumstances surrounding the interview, which we already have determined did not suggest coerciveness, supports the conclusion that the defendant's "off the record" statements were not involuntary. We do not foreclose the possibility that, in different circumstances, if a law enforcement officer tells a suspect that his statements will be "off the record," a tactic that should be avoided, subsequent statements by the suspect may be deemed involuntary because of the presence of indicia of coercion. Here, however, based on the totality of the circumstances surrounding the defendant's May 8 interview with Trooper Cummings, that is not the case.

3. *Conclusion.* The defendant's "off the record" statements were not involuntary, and, therefore, his motion to suppress was properly denied.

*Judgments affirmed.*

Gants, J. (dissenting, with whom Ireland, C.J., joins). I agree with the court that the defendant was not in custody during the interrogation and therefore was not entitled to the warnings required under *Miranda* v. *Arizona*, 384 U.S. 436 (1966) (*Miranda*). I also agree that the sole issue in this case is whether the Commonwealth has met its burden of proving beyond a reasonable doubt that the defendant's statements to Trooper Peter Cummings and the Chelmsford fire investigator that Trooper Cummings assured the defendant were "off the record" were

made voluntarily, and that the voluntariness of these "off the record" statements is based on the totality of the circumstances. I further agree that the record suggests that the defendant was intelligent, that he was not under the influence of drugs or alcohol at the time of the interview, and that the only aspect of the interview that raises an issue of voluntariness is Trooper Cummings's assurance to the defendant that certain statements were "off the record."

I respectfully dissent because I conclude that, where a law enforcement officer promises a suspect that what he says will be off the record, and the suspect speaks to the police in reliance on that promise, the failure to keep that promise is so significant a factor in the totality of the circumstances that it alone suffices to render such statements involuntary. Because the off-the-record statements that were not suppressed were important evidence of the defendant's motive to commit the arson, I conclude that the judge's error in denying the motion to suppress these statements was not harmless beyond a reasonable doubt, and that the judgment of conviction should be reversed and the case remanded for a new trial.

The phrase, "off the record," has two meanings: "not recorded as official evidence of a proceeding, such as a trial or deposition," Black's Law Dictionary 1196 (9th ed. 2009), and "[c]onfidential; not for publication or attribution." The Dictionary of American Slang 398 (3d ed. 1995). See Black's Law Dictionary, *supra* ("not intended for quotation or attribution"); American Heritage Dictionary of the English Language 1221 (4th ed. 2006) ("[n]ot for publication or attribution"). Under the first meaning, a statement that is "off the record" would not be admitted in evidence at a criminal trial. Under the second meaning, a statement that is "off the record" may not be quoted or attributed to the declarant, but may be used by the listener to provide background or context to other information the listener has learned, or to develop new information, such as by providing leads that a reporter or investigator may follow up. Under either meaning, an investigator who agrees to accept information from a suspect "off the record" agrees not to testify at trial as to what the declarant said off the record. Here, Trooper Cummings did just that, and the motion judge concluded that

"the defendant was likely misled concerning the ultimate use against him" of the statements he made "off the record."[1]

In *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 432 (2004), we recognized that police "trickery" during an interrogation may cast doubt on the voluntariness of a suspect's statement. The trickery at issue in that case was the use of a ruse to make the suspect believe that the police had more evidence than they did. *Id.* at 427 (police suggested to suspect that they possessed videotape surveillance recording of area around residence on day it burned). We concluded that "where the use of a false statement [by the police] is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression, but . . . if the circumstances contain additional indicia suggesting involuntariness, suppression will be required" (emphasis in original). *Id.* at 433, and cases cited. See *United States* v. *Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006), quoting *Clanton* v. *Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997) ("It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him").

But there are at least three other forms of police trickery that more severely undermine voluntariness: false promises of leniency in return for a suspect's statement, false representations regarding the defendant's right to defend himself at trial, and false promises that the statement will not be used against the suspect. As to false promises of leniency, we have said:

> "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." (Footnotes omitted.)

*Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert.

---

[1] At trial, Trooper Peter Cummings admitted that he had lied to the defendant when he assured him that what he said would be "off the record."

dismissed, 445 U.S. 39 (1980). We have more recently reaffirmed that, where this line is crossed, the suspect's statements will be found involuntary. See *Commonwealth* v. *Novo*, 442 Mass. 262, 269 (2004) (because other grounds tainted defendant's confession, "we need not determine whether any implied assurance of leniency made to [the defendant] crossed the line we set out in *Commonwealth* v. *Meehan*, [*supra*]"); *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997) ("officer suggesting that the defendant should tell 'his side of the story' fell short of the assurance prohibited in *Meehan*"). See also *United States* v. *Lopez*, *supra* at 1064-1065 (confession involuntary where Federal agent promised that defendant will spend fifty-four fewer years in prison if he confessed to killing victim by mistake).

As to false representations regarding the defendant's right to defend himself at trial, where the interrogating police officer told the defendant that this was his "only opportunity" to offer an explanation for why he hit the victim and "[i]f you don't give us a reason . . . a jury's never going to hear a reason," we declared that the misrepresentation of the defendant's right to defend himself at trial "is a particularly egregious intrusion" on a fundamental right that "is different in degree from false statements regarding the strength or existence of incriminating evidence." *Commonwealth* v. *Novo*, *supra* at 268, 269. We concluded that this type of misrepresentation "casts substantial doubt on the voluntariness of a subsequent confession and on the integrity of the interrogation process leading up to it . . . [that] would be extremely difficult for the Commonwealth to overcome in any case, and it has not done so here." *Id.* at 269.

The misrepresentation at issue here — false promises that a statement will not be used against the suspect — casts as much substantial doubt on the voluntariness of the statement as false promises of leniency and false representations regarding the defendant's right to defend himself at trial. Where the police falsely assure a suspect that his statement will aid the defense or result in a lesser sentence, the suspect is misled to believe that he will help himself by making a statement to the police. Where the police falsely represent a suspect's right to defend himself at trial, the suspect is misled to believe that he must

speak now or lose the opportunity to offer an explanation as to what happened or the reasons underlying his actions. Where the police falsely promise that a suspect's statement will not be used against him, the suspect is misled to believe that what he says to the police will not be repeated before a grand jury or at trial. "[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *United States* v. *Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993).[2]

A suspect's understanding that anything he says can and will be used against him is so fundamental that where a suspect is in custody, the United States Supreme Court requires that a suspect be so advised as part of the Miranda warnings. *Miranda, supra* at 469. The police owe no obligation to furnish this warning to a suspect, like the defendant, who is not in custody when inter-rogated, but there is a world of difference between the police remaining silent as to whether a suspect's statement will be used against him and the police affirmatively telling a suspect

_____

[2]Judge Richard A. Posner has written that "the courts' actual as distinct from articulated standard [for involuntariness] is to ask whether the govern-ment has made it impossible for the defendant to make a *rational* choice as to whether to confess — has made it in other words impossible for him to weigh the pros and cons of confessing" (emphasis in original). *United States* v. *Rut-ledge*, 900 F.2d 1127, 1129 (7th Cir.), cert. denied, 498 U.S. 875 (1990). He explained:

> "If the officers, fully intending to use anything [the defendant] said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confes-sion had been extracted by fraud and was involuntary. . . . For in our hypothetical case the officers would have deflected [the defendant] from weighing the pros and cons of confessing and going in the direc-tion that the balance leaned. Alternatively, [the defendant] could in our hypothetical case hold the government to its promise, and could do so whether or not the promise was fraudulent."

*Id.* at 1130. See *United States* v. *Male Juvenile (95-CR-1074)*, 121 F.3d 34, 41 (2d Cir. 1997) (question of voluntariness "is whether the government agents somehow misled defendant into believing that he could choose to speak without consequences, thus denying him any rational choice of whether to waive his rights and confess").

that his statement will *not* be used against him. "It is only through an awareness of these consequences [that anything said can and will be used against a suspect] that there can be any assurance of real understanding and intelligent exercise of the privilege [against self-incrimination]." *Id.* Consequently, where a suspect is assured by an interrogating law enforcement officer that his statement will not be used against him, a statement arising from such an assurance is involuntary. See *Streetman* v. *Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) ("[C]ertain promises, if not kept, are so attractive that they render a resulting confession involuntary. . . . A promise of immediate release or that any statement will not be used against the accused is such a promise"). See also *United States* v. *Lall*, 607 F.3d 1277, 1285-1288 (11th Cir. 2010); *Hopkins* v. *Cockrell*, 325 F.3d 579, 584-585 (5th Cir.), cert. denied sub nom. *Hopkins* v. *Dretke*, 540 U.S. 968 (2003); *Henry* v. *Kernan*, 197 F.3d 1021, 1027-1028 (9th Cir. 1999), cert. denied, 528 U.S. 1198 (2000); *United States* v. *Swint*, 15 F.3d 286, 289-292 (3d Cir. 1994); *United States* v. *Walton*, *supra* at 1029-1032; *United States* v. *Conley*, 859 F. Supp. 830, 836 (W.D. Pa. 1994), aff'd, 92 F.3d 157 (3d Cir. 1996), cert. denied, 520 U.S. 1115 (1997).

In *United States* v. *Lall*, *supra* at 1287, a detective "explicitly assured [the defendant] that anything he said would not be used to prosecute him" and there was "ample record evidence to support a finding that [the detective's] promise was deceptive." The prosecution argued that the assurances by a State law enforcement officer did not bar the use of the resulting confession in a Federal prosecution, but the United States Court of Appeals for the Eleventh Circuit rejected this argument, concluding that "the only plausible interpretation of [the detective's] representations, semantic technicalities aside, was that the information [the defendant] provided would not be used against him by [the detective] or anyone else." *Id.* Even though the defendant had received Miranda warnings advising him that everything he said can and will be used against him, the court held that the detective's statements "were sufficient to render [the defendant's] confession involuntary and to undermine completely the prophylactic effect of the Miranda warnings [the detective] previously administered." *Id.*

In *Hopkins* v. *Cockrell, supra* at 584, the law enforcement officer "assured [the defendant] that their conversation was confidential, telling [the defendant], 'This is for me and you. This is for me. Okay. This ain't for nobody else.' " The United States Court of Appeals for the Fifth Circuit held that the defendant's confession was involuntary. *Id.* at 585. The court declared, "An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant." *Id.*[3]

In *Henry* v. *Kernan, supra* at 1027, the defendant, who was in custody, invoked his right to counsel, but the detective continued to question him, in violation of the *Miranda* decision. After the defendant, who continued to answer the detective's questions, asked whether he was "supposed to keep talking without an attorney," the detective told him, "Listen, what you tell us we can't use against you right now. . . . We'd just would like to know." *Id.* The United States Court of Appeals for the Ninth Circuit declared that the detective's "misleading comments were intended to convey the impression that anything said by the defendant would not be used against him for any purposes." *Id.* at 1027-1028. The court held that the statements the defendant made after he invoked his right to counsel were involuntary, and therefore could not be used for impeachment purposes. *Id.* at 1029.

In *United States* v. *Swint, supra* at 287, the defendant accepted an invitation to make an "off-the-record proffer regarding the cooperation he could provide in exchange for a negotiated plea on the outstanding charges against him." After the defendant denied any wrongdoing, Federal agents joined the State and local law enforcement officers in the interview room, and urged the defendant to cooperate, telling him they had a warrant for his arrest on Federal drug charges with a ten-year mandatory sentence. *Id.* at 288. The defendant conferred with his attorney, agreed to cooperate with the Federal agents, and

---

[3]Although the court concluded that the confession was involuntary, it did not vacate the defendant's conviction, finding the error harmless. *Hopkins* v. *Cockrell*, 325 F.3d 579, 585 (5th Cir.), cert. denied sub nom. *Hopkins* v. *Dretke*, 540 U.S. 968 (2003).

made inculpatory statements. *Id.* The United States Court of Appeals for the Third Circuit concluded that the statements were involuntary, noting that the statements were made in an "informal, off-the-record proffer," that neither the defendant nor his attorney were informed that Federal agents would be at the proffer meeting or that Federal charges would be discussed, and that "neither the state nor federal agents clearly informed [the defendant] or his attorney that [the defendant's] statements to the [Federal] agents would not be off-the-record." *Id.* at 290.

In *United States* v. *Walton*, 10 F.3d 1024, 1027 (3d Cir. 1993), during a noncustodial meeting between the defendant and a Federal agent on a park bench, the Federal agent told the defendant, "I've known you for a long time. If you want, you can tell us what happened off the cuff." The defendant then made admissions that the prosecution used against him at trial. The United States Court of Appeals for the Third Circuit concluded that the confession was involuntary, noting that "there was no reason for [the defendant] to disbelieve [the Federal agent] that nothing he said would be used against him." *Id.* at 1030. "A person without prior exposure to the criminal justice system, even one with [the defendant's] intelligence and education, could easily be taken in and induced to speak under these circumstances." *Id.*[4] See *United States* v. *Conley*, 859 F. Supp. 830, 833 (W.D. Pa. 1994) (defendant's statements held involuntary where Federal agent assured him that what he said was "off the record"). In each case, the court determined the voluntariness of the defendant's statement under the totality of the circumstances, but the circumstance that controlled the finding of voluntariness was the false assurance that the statement would not be used against the defendant.

---

[4]The court seeks to distinguish the holding in *United States* v *Walton*, 10 F.3d 1024 (3d Cir. 1993), from the instant case by noting that the Federal agent in the *Walton* case had a prior relationship with the suspect, while Trooper Cummings had no prior relationship with the defendant. See *ante* at 210 n.7. That prior relationship was relevant only because it strengthened the inference that the defendant believed the Federal agent's assurance that he would not use what he said against him. *United States* v. *Walton, supra* at 1030. Here, where Trooper Cummings expressly agreed that part of what the defendant said would be off the record and even negotiated with the defendant to place certain off-the-record statements "on the record," there is no reason for the defendant to have disbelieved the trooper's assurance.

In the only case I have found where an appellate court did not hold a defendant's statements involuntary after an interrogating officer assured the defendant that his statements would not be used against him, *United States* v. *Flemmi*, 225 F.3d 78, 82 (1st Cir. 2000), cert. denied, 531 U.S. 1170 (2001), the motion judge found that Federal agents had promised the defendant both use and derivative use immunity when he worked as their informant. The immunity that was promised not only protected the defendant from the admission in evidence of statements he made to Federal agents while serving as an informant, but also protected him from any derivative use of these statements, and from any use, direct or derivative, of all conversations intercepted during the course of court-authorized electronic surveillance at three separate locations, even conversations in which the defendant did not participate. *Id.* at 82-83. The United States Court of Appeals for the First Circuit held that these broad promises of use and derivative use immunity were unenforceable because Federal agents lacked the authority to make them. *Id.* at 91. The court briefly addressed the defendant's claim of involuntariness, and rejected it because there was no evidence of any threats, retaliation, violence, or "consciously misleading conduct on the part of the [Federal] agents," and because the defendant was neither incarcerated nor under investigation at the time of the asserted promise, and "enjoyed a friendly — even social — relationship" with the Federal agents. *Id.* at 92. In short, the promises made to Flemmi were extraordinarily broad claims of immunity that exceeded the authority of the Federal agents and these promises were made to him as an informant, not as a suspect during interrogation. Therefore, the circumstances in the *Flemmi* case are far different from those in the other cases cited. Even the *Flemmi* court appeared to recognize that its case was distinguishable because it cited with approval both *United States* v. *Swint*, 15 F.3d 286, 290-291 (3d Cir. 1994), and *United States* v. *Walton, supra* at 1028. See *United States* v. *Flemmi, supra.*

The court's opinion recognizes that assuring a suspect that his statements will be "off the record" and then repeating those statements at trial is "a tactic that should be avoided," *ante* at 212, but it fails to acknowledge what virtually every court con-

fronting a comparable assurance has recognized — that statements induced by such assurances are involuntary. I conclude that the statements the defendant made "off the record" should be suppressed, and the conviction should be reversed because the admission of these statements was not harmless beyond a reasonable doubt.[5] I respectfully dissent.

---

[5] At a retrial, the prosecution would be able to offer in evidence all of the defendant's statements to Trooper Cummings and the fire investigator except those made off the record during the interview, including all the information that Trooper Cummings included in his report of the interview.